No. 23-2462

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN J. JIMENEZ,

Defendant-Appellant.

_____

Appeal from Judgment in the United States District Court
for the Northern District of Illinois, Eastern Division.
District Court Case No. 1:16-cr-00463
The Honorable Virginia M. Kendall, Chief Judge.

**DEFENDANT JIMENEZ'S OPENING BRIEF
AND REQUIRED APPENDIX**

Hannah Valdez Garst
*Attorney for Juan Jimenez*
Law Offices of Hannah Garst, P.C.
121 S. Wilke Road, Suite 301
Arlington Heights, IL 60005
773-248-6504
hannahgarst@garstlaw.com

**Oral Argument Requested**

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: **23-2462**

Short Caption: **U.S. v. Juan J. Jimenez**

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.

> [ ] PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3): Juan J. Jimenez

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court: Law Offices of Hannah Garst, P.C.; Michael B. Nash

(3)      If the party, amicus or intervenor is a corporation:

    i)      Identify all its parent corporations, if any; and: n/a

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock: n/a

(4) Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases: n/a

(5) Provide Debtor information required by FRAP 26.1 (c) 1 & 2: n/a

Attorney's Signature: /s/*Hannah V. Garst*_____ Date: 3/17/25
Attorney's Printed Name:  Hannah V. Garst
Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).
Yes ✓ No __
Address:  _121 S. Wilke Rd., Ste. 301, Arlington Heights, IL_60005
Phone Number: 773-248-6504
Fax Number: 773-305-5183
E-Mail Address:  _hannahgarst@garstlaw.com

**TABLE OF CONTENTS**

DISCLOSURE STATEMENT ....................................................................... ii

TABLE OF AUTHORITIES ........................................................................ vi

JURISDICTIONAL STATEMENT ................................................................1

ISSUES PRESENTED FOR REVIEW ..........................................................2

    I.    Did the court err when it failed to address Mr. Jimenez's principal argument in mitigation at sentencing? ................................................2

    II.    Should Mr. Jimenez's sentence be vacated and remanded for resentencing following the retroactively applied Amendment 821? ...2

    III.    Did the district court err when it counted a prior shooting as a predicate act rather than solely a prior sentence? ..............................2

    IV.    Did the district court err when it sentenced Mr. Jimenez based on acquitted conduct? ...................................................................................2

    V.    Were any errors in calculating the guidelines harmless? ...................2

STATEMENT OF THE CASE......................................................................2

    I.    Underlying Facts ...................................................................................2

    A. Trial ......................................................................................................2

    B. Presentence Investigation Report......................................................4

        1. Fabian Salgado Shooting................................................................5

        2. Murder of Isaias Cintron................................................................5

        3. Advisory Guideline Computation..................................................6

    C. Sentencing ...........................................................................................8

1. Objections Prior to Sentencing........................................................8

2. Sentencing Hearing- July 26, 2023............................................11

II.  Relevant Guideline Changes and Amendment 821 ..........................19

SUMMARY OF ARGUMENTS........................................................................20

ARGUMENTS................................................................................................23

I. Mr. Jimenez's sentence should be vacated and remanded for resentencing,
because the district court failed to address his principle argument in
mitigation ................................................................................................23

A. Standard of Review...............................................................................23

B. Applicable Case Law.............................................................................23

C. The district court should address Mr. Jimenez's principal argument in
mitigation at resentencing .................................................................24

II.  This matter should be reversed and remanded for resentencing because
Mr. Jimenez qualifies for a reduction under Amendment 821 to the U.S.
Sentencing Guidelines............................................................................27

A. Standard of Review...............................................................................27

B. Mr. Jimenez qualifies for retroactive application of Amendment 821
pursuant to Amendment 825 .............................................................27

C. This Court should reverse and remand for resentencing.....................28

III.  The district court erred when it used the Salgado shooting as a
predicate act rather than counting it only as a prior sentence ...............31

A. Standard of Review...............................................................................31

B. Because the Salgado shooting resulted in a conviction prior to the last
overt act of the racketeering conspiracy, the predicate act should have
only been counted as a prior sentence .................................................31

IV.  Use of acquitted conduct to enhance Mr. Jimenez's sentence is constitutionally impermissible under the Due Process Clause of the Fifth Amendment and his right to a jury trial under the Sixth Amendment...35

    A.  Standard of Review ...............................................................................35

    B.  The district court improperly sentenced Mr. Jimenez based on acquitted conduct ...................................................................................35

V. Any error in calculating the guidelines is not harmless .............................37

CONCLUSION ...............................................................................................40

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7), FED. R. APP. P. 32(g) and CIR. R. 32(c) ......................................................41

PROOF OF SERVICE ....................................................................................42

CERTIFICATE OF COMPLIANCE WITH CIR. R. 30(d) ..............................43

REQUIRED SHORT APPENDIX ..................................................................44

# TABLE OF AUTHORITIES

**Cases**

*Cross v. United States*, 892 F.3d 288 (7th Cir. 2018) ........................................ 37

*Gall v. United States*, 552 U.S. 38 (2007) ......................................................... 23

*McClinton v. United States*, 143 S. Ct. 2400 (2023) ........................................ 36

*Perez v. United States*, No. 13 C 4478, 2015 U.S. Dist. LEXIS 171543 (N.D. Ill. Dec. 22, 2015) ......................................................................................... 32

*Peugh v. United States*, 569 U.S. 530 (2013) .................................................... 39

*Rita v. United States*, 551 U.S. 338 (2007) ....................................................... 23

*Rosales-Mireles v. United States,* 138 S. Ct. 1897 (2018) ............................... 39

*State Oil Co. v. Khan*, 522 U.S. 3 (1997) ............................................................ 37

*United States v. Abbas*, 560 F.3d 660 (7th Cir. 2009) ...................................... 38

*United States v. Asbury*, 27 F.4th 576 (7th Cir. 2022) ..................................... 40

*United States v. Baker,* 445 F.3d 987 (7th Cir. 2006) ...................................... 25

*United States v. Baker*, 56 F.4th 1128 (7th Cir. 2023) ..................................... 29

*United States v. Caraway*, 74 F.4th 466 (7th Cir. 2023) .................................. 29

*United States v. Claybron*, 88 F.4th 1226 (7th Cir. 2023) ................... 20, 28, 29

*United States v. Cook*, 850 F.3d 328 (7th Cir. 2017) ........................................ 31

*United States v. Cunningham,* 429 F.3d 673 (7th Cir. 2005) ...................... 23, 26

*United States v. De La Cruz*, 897 F.3d 841 (7th Cir. 2018) .............................. 32

*United States v. Easterling*, No. 23-1143, 2025 U.S. App. LEXIS 2376 (7th Cir. Feb. 3, 2025) ....................................................................................... 29, 30

*United States v. Hill*, 645 F.3d 900 (7th Cir. 2011) ..................................... 31, 37

*United States v. Jett*, 982 F.3d 1072 (7th Cir. 2020)........................................ 40

*United States v. Loving*, 22 F.4th 630 (7th Cir. 2022) .................................... 38

*United States v. McClinton*, 23 F.4th 732 (7th Cir. 2022) .............................. 35

*United States v. Poetz*, 582 F.3d 835 (7th Cir. 2009) ..................................... 23

*United States v. Prieto*, 85 F.4th 445 (7th Cir. 2023)................................. 27, 31

*United States v. Qualls*, 373 F. Supp. 2d 873 (E.D. Wis. 2005) ...................... 25

*United States v. Robinson*, 62 F.4th 318 (7th Cir. 2023) ........................... 35, 37

*United States v. Shelton*, 905 F.3d 1026 (7th Cir. 2018) .............................. 37

*United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018) ................................. 27

*United States v. Villegas-Miranda*, 579 F.3d 798 (7th Cir. 2009)................... 26

*United States v. Watkins*, 107 F.4th 607 (7th Cir. 2024)............................... 32

*United States v. Watts*, 519 U.S. 148 (1997).................................................. 35

*United States v. Wilcher*, 91 F.4th 864 (7th Cir. 2024).................................. 23

**Statutes**

18 U.S.C. § 1962................................................................................... 2, 7

18 U.S.C. § 3231.......................................................................................... 1

18 U.S.C. § 3553............................................................................... 9, 26, 38

18 U.S.C. § 3582........................................................................................ 20

18 U.S.C. § 3742.......................................................................................... 1

28 U.S.C. § 1291.......................................................................................... 1

28 U.S.C. § 2106........................................................................................ 28

Indiana Code § 35-42-1-1(1) .......................................................................... 3

## Other Authorities

*An Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories,* U.S. Department of Justice, Executive Summary (February 4, 1994)........ 25

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-IFC.pdf ........................................ 19

U.S.S.G. § 1B1.3...................................................................................... 36

U.S.S.G. § 2A2.1.................................................................................. 6, 33

U.S.S.G. § 2E1.1.................................................................................passim

U.S.S.G. § 4A1.1.................................................................... 7, 20, 28, 33

U.S.S.G. § 4A1.2.................................................................................. 32, 34

U.S.S.G. App. C, Amend. 826................................................................... 36

U.S.S.G. Ch. 5, pt. A ................................................................................ 39

U.S.S.G., Amend. 821 ................................................................. 20, 27, 28, 29

U.S.S.G., Amend. 825 ..................................................................... 27, 28, 29

## Rules

Rule 4(b) of the Federal Rules of Appellate Procedure..................................... 1

## JURISDICTIONAL STATEMENT

This is a direct appeal of Juan Jimenez's federal criminal conviction and sentence. Defendant-Appellant was named in a Second Superseding Indictment, charging him with racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 2, including a Notice of Special Finding that Mr. Jimenez murdered Isaias Cintron on January 18, 2007. R. 1378. In April 2019, following a six-week jury trial, the jury found Mr. Jimenez guilty of the racketeering conspiracy but not guilty of the Cintron murder. R. 1594. On July 26, 2023, the district court sentenced Mr. Jimenez to 240 months' imprisonment and 3 years' supervised release, and the judgment was entered that next day. R. 2910; SA 1-8. A notice of appeal was timely filed on July 27, 2023. R. 2907. Pursuant to this Court's order, this appeal has been consolidated with that of co-defendants Carlos Padilla, Jr., Case No. 22-2907, Miguel Denava, Case No. 23-2754, Carlos Lopez, Sr., Case No. 24-1356, Raul Cavillo, Case. No. 24-1375, and Joel Nunez, Case No. 24-2657.

The jurisdiction of the district court was pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over direct criminal appeals pursuant to both 28 U.S.C. § 1291 and Rule 4(b) of the Federal Rules of Appellate Procedure. This Court has jurisdiction over the appeal of the sentence imposed pursuant to 18 U.S.C. § 3742(a).

## ISSUES PRESENTED FOR REVIEW

1.  Did the court err when it failed to address Mr. Jimenez's principal argument in mitigation at sentencing?

2.  Should Mr. Jimenez's sentence be vacated and remanded for resentencing following the retroactively applied Amendment 821?

3.  Did the district court err when it counted a prior shooting as a predicate act rather than solely a prior sentence?

4.  Did the district court err when it sentenced Mr. Jimenez based on acquitted conduct?

5.  Were any errors in calculating the guidelines harmless?

## STATEMENT OF THE CASE

### I.    Underlying Facts

#### A. Trial

The government charged Mr. Jimenez with racketeering conspiracy, in violation of 18 U.S.C. §§ 1962(d) and 2, including a Notice of Special Finding. R. 1378. The government charged that in or about the late 1990s and continuing through the present, Defendant Jimenez, Miguel Denava, Thomas Luczak, and Emanuel Mendez, and others known and unknown to the Grand Jury, being persons employed by and associated with the Latin Kings, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, knowingly conspired to violate 18 U.S.C. § 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of

2

the affairs of that enterprise through a pattern of racketeering activity consisting multiple acts involving murder, arson, robbery, extortion, acts relating to tampering with a witness, victim or informant and offenses involving the illegal distribution of controlled substances. R. 1378: 6-7. It was a further part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise. *Id.* at 7. This was all in violation of 18 U.S.C. §§ 1962(d) and 2. The government further charged a Notice of Special Finding that Mr. Jimenez murdered Cintron on or about January 18, 2007, in violation of Indiana Code § 35-42-1-1(1). *Id.* at 13-14, 16.

On March 6, 2019, Mr. Jimenez proceeded to trial along with co-defendants Miguel Denava, Thomas Luczak, and Emanuel Mendez. (R. 1604). On April 15, 2019, following a six-week jury trial, the jury found Mr. Jimenez guilty of the racketeering conspiracy but acquitted him of the Cintron murder. R. 1608: 4344-45; R. 1594. The jury did not find that the racketeering activity included the first-degree murder of Cintron and was not committed while Jimenez committed or attempted to commit criminal gang activity. R. 1608: 4345. Interestingly, the jury acquitted Mendez of all charges and found Denava and Luczak guilty of the conspiracy but acquitted them of all special findings. *Id.*: 4344-46.

3

**B. Presentence Investigation Report**

On July 22, 2019, U.S. Probation filed its presentence investigation report ("PSR"). R. 1735. The PSR explained the organization of the Latin Kings, a national street gang organized by geographical locations into "regions." R. 1735: 7. Each region has leadership responsible for overseeing chapters in that region. *Id.* at 8. The jury found Mr. Jimenez guilty of

> knowingly and intentionally conspired with the leadership, members, and associates of the Latin Kings to engage in a pattern of racketeering activity for and on behalf of the Latin Kings. As part of his membership in the Latin Kings, the defendant agreed and knew that a co-conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Latin Kings.

*Id.* at 9. Joining the Latin Kings typically required members "to 'prove' themselves, such as by carrying firearms, patrolling the neighborhood, defending the gang's territory, doing acts of violence on behalf of the gang, and participating in other gang activity." *Id.*

The PSR noted that the government contended that Mr. Jimenez joined the Dolton chapter of the Latin Kings in approximately 2003. *Id.* He held the position of Enforcer for a short time in 2007 and then transitioned to the Regional Treasurer in late 2007. *Id.* According to the government, Mr. Jimenez held this position until 2014. Probation also noted that FBI Special Agent Peetz that in his interview with Mr. Jimenez on January 6, 2016, Mr.

4

Jimenez admitted to being a member of the Dolton Chapter of the Latin Kings from 2003 to 2013. *Id.*

### 1.  Fabian Salgado Shooting

On November 3, 2003, Mr. Jimenez was driving his car when he saw Fabian Salgado driving a van, who he believed to be a Satan Disciple. R. 1735: 54 (Exh. A). Mr. Jimenez reported that he and his brother had problems with the SD's in the past. *Id.* He and his passenger, "Sleepy," pulled up behind Salgado, and Mr. Jimenez handed Sleepy the gun. *Id.* at 55. Sleepy fired the gun into Salgado's van. *Id.* Salgado was not injured during this incident. *Id.* at 12.

Mr. Jimenez was charged with this incident in Cook County with aggravated unlawful use of a weapon (AUUW). R. 1735: 57-69 (Exh. B). He pleaded guilty to one count of AUUW and was sentenced to two years' probation. *Id.* at 12, 67.

### 2.  Murder of Isaias Cintron

The government alleged that Mr. Jimenez was the driver on January 18, 2007, when two Latin Kings opened fired on Cintron and three others in Whiting, Indiana. *Id.* at 13. Cintron was shot multiple times and died. *Id.* The jury, however, acquitted Mr. Jimenez of this conduct and found that the government did not prove that the racketeering activity upon which his conviction was based included the commission, or aiding and abetting the

commission, of the first-degree murder of Isaias Cintron or that the killing of Cintron was committed while Mr. Jimenez committed or attempted to commit criminal gang activity. *Id.* at 13-14.

### 3. Advisory Guideline Computation

Using the 2018 Guidelines Manual, Probation considered the only count of conviction: racketeering conspiracy. R. 1735: 15. For racketeering, each underlying offense is to be treated as if it were contained in a separate count of conviction. U.S.S.G. § 2E1.1, app. n.1. Probation contended:

> the underlying racketeering activity in this case, for which the government has provided the most compelling evidence, is the attempted murder of Fabian Salgado. The probation office is not including the murder of Isaias Cintron as a predicate offense because the government's evidence, i.e., the testimony of government cooperators Ivan Quiroz and Luis Bravo, was not sufficient to prove 1) that the racketeering activity upon which Defendant Jimenez's conviction is based included the commission, or aiding and abetting the commission, of the first-degree murder of Isaias Cintron or 2) that the killing of Isaias Cintron was committed while Defendant Jimenez committed or attempted to criminal gang activity.

*Id.* In applying U.S.S.G. § 2E1.1, probation included the attempted murder of Salgado, and the guideline for attempted murder is U.S.S.G. § 2A2.1(a)(2) provides for a base offense level of 33. Because a 33 is greater than 19, the offense level for the attempted murder applied. *See* U.S.S.G. §§ 2E1.1(a) & 2A2.1(a)(1). R. 1735: 15.

6

Mr. Jimenez also received a 3-level adjustment for being a manager in the conspiracy. The government proposed that Mr. Jimenez should receive a 4-level adjustment for being a leader/organizer, but probation replied that Mr. Jimenez's role as treasurer was more akin to a manager rather than leader. *Id.* Mr. Jimenez's total offense level was 36.

As for criminal history, Mr. Jimenez received a total of five points: three single-point convictions and two-points for committing the instant offense while being under a criminal justice sentence. *Id.* at 17-18. The three single-point convictions were as follows: Aggravated Unlawful Use of a Weapon (conviction from the Salgado shooting), Possession of less than 15g of cocaine, and DUI. *Id.*; *see* U.S.S.G. § 4A1.1(c). The additional two points for being under a criminal justice sentence were connected to the possession of a controlled substance offense that occurred in 2005. R. 1735: 17-18. Therefore, Mr. Jimenez's total criminal history score was 5, resulting in criminal history category III. *Id.* at 18.

For a conviction pursuant to 18 U.S.C. § 1962(d), the statutory maximum term is 20 years' imprisonment and 3 years' supervised release. *Id.* at 29. The advisory guideline range for a total offense level 36, CHC III, is 235-293 months' imprisonment and 1-3 years' supervised release. *Id.* However, because the statutory maximum is 20 years, the guideline range was 235-240 months' imprisonment. *Id.*

7

### C. Sentencing

#### 1. Objections Prior to Sentencing

Over four years after the guilty verdict, on July 26, 2023, the Court conducted Mr. Jimenez's sentencing hearing. R. 2931. Prior to the hearing, both the government and Mr. Jimenez filed a sentencing memoranda. R. 1766; 2894. The government asserted that Mr. Jimenez should be held accountable for the Salgado shooting, the Cintron murder, and conspiracy to commit murder. R. 1766: 10-11. The government also asserted that Mr. Jimenez should receive levels for being a leader/organizer of the Latin Kings. *Id.* Overall, the government calculated the advisory guideline range at 44, CHC III resulting in an advisory range of life. *Id.* at 12. Because the statutory maximum sentence was 20 years, the government stated that the guidelines range would be 240 months. *Id.*

Mr. Jimenez focused on three objections. First, he asserted that the base offense level should be 19, not 33, because the Salgado shooting was not a gang act or in furtherance of the charged conspiracy and thus not underlying racketeering activity. R. 2894: 2-4 (citing U.S.S.G. § 2E1.1(a)(2)). He specifically stated that his "offense level should not be increased based on the Salgado shooting." R. 2894: 4.

As for the Cintron murder, Jimenez acknowledged the current state of the law, specifically that acquitted conduct could be considered, but noted his

8

agreement with probation that it should not in this case. *Id.* at 4-7. He also noted that the U.S. Sentencing Commission proposed an amendment to the guidelines that relevant conduct would no longer include conduct for which the defendant was criminally charged and acquitted in federal court. *Id.* at 7. Mr. Jimenez further asserted that even under a preponderance of the evidence standard, the facts of Cintron's murder would not pass muster. *Id.* at 8-13.

Mr. Jimenez also objected to the government's assertion that he was a leader/organizer and probation's conclusion that he was a manager. Mr. Jimenez asserted that there was no evidence that he led or organized anything, managed or supervised anyone, or exercised decision-making authority. *Id.* at 13. He only did what others told him to do, and thus no adjustment for role in the offense was proper. *Id.* at 13-14. Although acknowledging that Mr. Jimenez was given a title, he asserted that the evidence demonstrated that he only had an outlier role for the Latin Kings. *Id.* at 14.

Mr. Jimenez also set forth significant mitigation to be considered, pursuant to 18 U.S.C. § 3553(a). *Id.* at 15-19. First, he asserted that two of the three criminal history points and the Salgado shooting occurred approximately 20 years ago, and the jury acquitted him of the 2007 Cintron murder. *Id.* at 15-16. In the mid-2000s, his life began to change, and he

turned away from gang life, as evidenced by no evidence of him committing no additional crimes with the gang and his statement to the FBI that he was a Latin King but left in approximately 2013. *Id.* at 16, 20.

In addition, following his arrest on July 22, 2016, he was released on electronic monitoring. *Id.* At the time of the jury verdict, Mr. Jimenez had been on bond for almost three years, adhered to all conditions, and was continuously employed. *Id.* Even before his arrest, Mr. Jimenez was gainfully employed from 2001 up until trial. *Id.* at 16-17. When trial began, he had to quit his day job, but he still worked two jobs: delivering newspapers in the morning and a doorman/valet in the evening and on weekends. *Id.* at 17. The letters Mr. Jimenez confirmed that he was no longer the person he was 20 years ago. *Id.*

After the jury verdict, Mr. Jimenez was detained, but this did not stop him from making progress. *Id.* During the four years he waited to be sentenced including the COVID pandemic, Mr. Jimenez participated and completed multiple programs at the MCC. Mr. Jimenez asserted that this demonstrated how he was different from the many other defendants charged in the RICO conspiracy. *Id.* at 18. He gave specific examples of how co-defendant Edulio Cano's history of gang participation stood in stark contrast to his criminal history and history of employment. *Id.* Mr. Jimenez also noted

that like Cano, this would be his first custodial sentence. *Id.* at 19. None of his other convictions resulted in anything more than probation. *Id.*

### 2. Sentencing Hearing- July 26, 2023

After neither party objected to any of the facts laid out in the PSR, the district court adopted the PSR as written and proceeded to the guideline calculation. R. 2931: 4; SA 12. The government asserted that the Cintron murder should be included as a predicate racketeering act and thus the base offense level should be 43. *Id.* at 5. It also noted that the attempted murder of Salgado and the conspiracy to commit murder as a member of the Latin Kings would also be a 33 base offense level. *Id.* The government then added a 4-level leadership enhancement and concluded that Mr. Jimenez is off the chart and subject to the 20-year statutory maximum sentence. *Id.* Mr. Jimenez stated that he was objecting to all of this, and the government confirmed that it was not going to put on any evidence, "just argument." *Id.* at 6; SA 14.

Mr. Jimenez repeated the objections in his sentencing memorandum, specifically that the Salgado shooting should not be included because he was not a member of the Latin Kings at the time, any argument was personal and not gang related, and when he did join the Latin Kings, he was a member of the Dolton Region. *Id.* The Dolton Region was not part of the Southeast

11

Region, the region that formed the basis of the conspiracy charged. *Id*. Thus, this should not be included as a predicate act. *Id*. at 6-7; SA 14-15.

The government countered Mr. Jimenez's arguments. *Id*. at 7-11; SA 15-19. The government stated that the shooting of Salgado took place in November 2003, and according to Mr. Jimenez's statement to the FBI in January 2016, he was a member of the Dolton chapter starting in approximately 2003. *Id*. at 7-8; SA 15-16. As for the Dolton region, Vargas testified that it became part of the Southeast Region at some point in 2003. *Id*. at 8; SA 16. Therefore, the government stated that the evidence showed by a preponderance of the evidence that the Dolton Chapter was part of the Southeast Region by 2003. *Id*. Ultimately, however, the government stated that the scope of the charged conspiracy was not limited to how the gang defined itself at a specific point in time. *Id*. at 10; SA 18. As for the Salgado shooting being personal, the government responded that this was "a textbook case of the Latin Kings retaliating against a rival gang member and not something borne only out of personal animosity." *Id*.

After hearing from both parties, the district court concluded that based upon the trial testimony, the Salgado shooting was part of the conspiracy. *Id*. at 11; SA 19. The court stated,

> So I do find that the Salgado murder falls within the conspiracy,
> and that he was a member of the gang at the time, and that the
> fact that he joined the  Dolton Region really does not matter

12

because the Dolton Region was interchangeably used within the gang, and it really doesn't matter when it comes down to the indictment itself, which was being part of this national gang. So that will be my factual findings for Salgado – the predicate act for Salgado.

*Id.* at 12-13; SA 20-21.

The court next heard from the parties regarding the Cintron murder. The government first pointed out that this Court and the U.S. Supreme Court precedent does not preclude the use of acquitted conduct at sentencing as long as it is proven by a preponderance of the evidence. *Id.* at 13; SA 21. The government submitted that the evidence at trial demonstrated that it was more likely than not that Mr. Jimenez was among the Latin Kings involved in that shooting in January 2007. *Id.* at 14; SA 22. The government pointed to two witness statements by Cintron's passengers, Mark Rodriguez and Vincente Hernandez. *Id.* at 15-16; SA 23-24. The government also referred to testimony by Ivan Quiroz about how they were trying to find Latin Dragons at McTavern's bar in Indiana, and on the second attempt, Mr. Jimenez showed up as the driver with two shooters in a 4-door tinted Cadillac (allegedly Mr. Jimenez's car). *Id.*

Quiroz testified that he went inside the bar to look for Latin Dragons while communicating with "Tails." *Id.* at 16-17; SA 24-25. Quiroz identified a group of guys coming out, and Tails says we are on it. *Id.* at 17; SA 25. Quiroz then left and later saw Mr. Jimenez return in the Cadillac. *Id.* Later,

13

someone told Quiroz that they took care of it and believed everyone in the car was dead. *Id*. Quiroz also testified that when Mr. Jimenez was promoted to be Regional Treasurer, part of the reason he was approved was because Quiroz vouched for him based on the trust Mr. Jimenez had demonstrated by participating in the shooting and then staying quiet about it. *Id*. at 17-18; SA 25-26.

The government then recounted Vargas' testimony at trial about McTavern's being a target bar of the Latin Counts[1]. According to the government, Vargas also talked about how Quiroz had been inside, talking to Tails, and that they later completed the mission. However, the government then stated that Vargas met up with Tails, and Tails told him that they couldn't carry out the shooting outside of McTavern's, so they followed the car to another bar. *Id*. at 19; SA 27.

The government also referred to Luis Bravo's testimony. Bravo testified that Mr. Jimenez told him about scouting bars in Indiana to look for Latin Dragons, and that after Quiroz was indicted in 2010, Mr. Jimenez told him that he was worried because he'd done a shooting with Quiroz on Indiana in his Cadillac where he had been the driver. *Id*. The government added,

---

[1] The government acknowledged that the Latin Counts are a different gang than the Latin Dragons but reasoned that Vargas made an error in recalling which gang he was remembering. *Id*. at 18; SA 26.

14

without further explanation, that the ballistic evidence along with all the corroborative trial testimony met the preponderance standard. *Id.* at 19-20; SA 27-28.

Mr. Jimenez requested that the district court honor the jury's verdict. *Id.* at 20; SA 28. In addition, he noted that the evidence was insufficient even under the preponderance standard. *Id.* at 21; SA 29. He submitted that the only witness that testified about Mr. Jimenez's involvement was Quiroz, and he at one point said he was a shooter, not a driver, and this was inconsistent. *Id.* at 21-22; SA 29-30. As for Bravo, he asserted that the shooting occurred in three different towns in Indiana, and he also says Latin Dragons while Vargas says Latin Counts. *Id.* at 22-23. Also, Vargas testified that Quiroz told him that he (Quiroz) and Tails shot the Latin Counts. *Id.* at 23; SA 31. Vargas further testified that the next day, Tails calls him and says that he (Tails) and Quiroz did the shooting. *Id.* Neither named Mr. Jimenez. *Id.* As for Hernandez and Rodriguez, the two witnesses in Cintron's car, they said it happened immediately, that the shooters appeared to be waiting for them. *Id.* This was in direct conflict with the government's theory of the shooting. *Id.*

The district court noted that according to Bravo, Mr. Jimenez made a statement that he was worried about Quiroz's indictment, because Quiroz might cooperate against him. *Id.* at 23-24; SA 31-32. Mr. Jimenez responded that when Bravo was asked about which shooting in Indiana he was referring

15

to, he listed three different places, and Quiroz was involved in several murders in Indiana. *Id.* at 24; SA 32. Mr. Jimenez asserted that he shouldn't be sentenced for a predicate act if Bravo is referring to some other shooting. *Id.*

The government responded that the Cintron murder did take place in Whiting, Indiana, one of the three locations that Bravo testified that Mr. Jimenez had mentioned. *Id.* at 24-25; SA 32-33. The government also noted that Rodriguez testified that they pulled into the parking lot slowly and were trying to decide then whether to go to a different location when the gunshots erupted. *Id.* at 25; SA 33. The government concluded that the corroborative testimony, specifically Bravo referred to Quiroz and Mr. Jimenez's involvement with a shooting in Indiana, scouting bars in Indiana, and being a driver, meets the preponderance of the evidence standard.

After stating how horrible the murder was, the district court concluded that the evidence is more than sufficient to show by a preponderance of the evidence that he participated in the murder. *Id.* at 26; SA 34. The court noted that it was Jimenez's car, Jimenez showed up, and that Jimenez admitted to scouting the bars, and admitted that he was going to get in trouble after the Quiroz indictment. *Id.* "We have the matching shell casings. It's all circumstantial, but circumstantial evidence is the same." *Id.* The court noted that it did not believe that it would matter in the guideline calculation but by

16

a preponderance of evidence, it believed that he participated in the murder of Cintron. *Id.* at 27; SA 35.

As for the role enhancement for leader/organizer versus manager/supervisor, the court agreed with probation and applied the three-level enhancement. *Id.* at 29; SA 36. The court then concluded that with the Cintron murder, Mr. Jimenez would be at an offense level of 43 plus three-levels for manager/supervisor would land him at a 46. *Id.* at 29-30; SA 36-37. The court noted that would result in an advisory guideline range of life, but the statutory maximum sentence would be 240 months' imprisonment. *Id.* at 30; SA 38. Therefore, the guideline range was 240 months. *Id.*

Following the government review of the § 3553(a) factors and request for a sentence of 240 months' imprisonment, Mr. Jimenez reiterated many of the mitigation points that he included in his sentencing memorandum, including his long employment record, who he was on the date of sentencing (2023) versus who he was before 2013, his compliance on bond, his accomplishments at the MCC, and that this would be his first custodial sentence. *Id.* at 35-38; SA 43-46. Mr. Jimenez then spoke to the court. Mr. Jimenez took responsibility for his previous lifestyle and "demented"

17

actions. *Id*. at 38; SA 46. He discussed how his life has changed since being indicted and his goals following release from incarceration. *Id*. at 39; SA 47.

In pronouncing sentence, the district court described the gang and the havoc it wreaked on the community. *Id*. at 40-41; SA 48-49. The court then focused on the Cintron murder, noting that Mr. Cintron was military and trying to hang out with his friends when he died trying to protect them. *Id*. at 41; SA 49. "So the sanction for that has to be significant." *Id*. "You're linked to both his murder as well as the other attempted murder, and that kind of violence is what is breaking apart our community." *Id*. at 41-42; SA 49-50. The court then noted that added to the violence was the drug dealing and witness intimidation. *Id*. at 42; SA 50. "So I can't mitigate any of that activity. It is really the type of activity that is breaking apart this beautiful community, and it's not something that can be explained except as something horrific." *Id*. The court then noted that it considered it aggravating that he did not start with the gang until he was in his 20s, and he was old enough to make decisions. *Id*. His involvement in the gang lasted a long time and he had a leadership role as treasurer and cannot be minimized. *Id*. at 43; SA 51. In comparison with other gang members, the court mentioned that he was more in line with others involved with the murder and attempted murders,

18

William Hayslette and Geronia Ford but noted that he was probably closest to Carlos Padilla who received 235 months. *Id.*

The court noted that his sentencing guideline was a 46, CHC III, and even if it were to depart downward 10 levels, he would still be looking at 235-293 "which I don't see the mitigation to do that." *Id.* at 44; SA 52. "So because of your role within this horrific organization and the pervasiveness of it, I am sentencing you to 240 months' imprisonment, followed by three years of supervised release." *Id.* The court stated that he'd be facing much more time but for the statutory maximum sentence. *Id.* The court then added: "The thing that I think is really critical to state here, though, because of the state of the law, even if I did not hold you responsible for the Cintron murder, I would still sentence you to 240 months, even if I didn't credit that factually." *Id.* The court reviewed the supervised release conditions, and neither party objected. *Id.* at 47-48; SA 55-56.

## II.    Relevant Guideline Changes and Amendment 821

On February 2, 2023, the United States Sentencing Commission issued Proposed Amendments to the Sentencing Guidelines, which included an amendments to the criminal history guidelines limiting the effect of status points. *See* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20230405_prelim-IFC.pdf (last visited 3/3/25). On August 31, 2023, the Commission announced that Amendment

19

821, which limited the criminal history impact of status points under § 4A1.1(d), would be retroactive by operation of Amendment 825. U.S.S.G. Manual Amend. 821, 825 (2003). The amended guidelines went into effect on November 1, 2023. See https://www.ussc.gov/guidelines/amendments/ adopted-amendments- effective-november-1-2023 (last visited 3/3/25). Amendment 825 instructs that courts shall not order a reduced term of imprisonment based on Amendment 821 unless the effective date of the court's order is February 1, 2024, or later. *See United States v. Claybron*, 88 F.4th 1226, 1228 (7th Cir. 2023).

Mr. Jimenez qualifies for a reduction in his criminal history category due to the retroactive application of Amendment 821. After the amendment, Mr. Jimenez would no longer have two status points pursuant to U.S.S.G. § 4A1.1(d) and would only have three criminal history points. This would result in criminal history category II rather than criminal history category III. No motion pursuant to 18 U.S.C. § 3582(c)(2) has been filed on Mr. Jimenez's behalf.

## SUMMARY OF ARGUMENTS

This Court should vacate and remand Mr. Jimenez's sentence, because the district court failed to address his principal argument in mitigation, namely that Mr. Jimenez was a completely different person since he left the gang 10 years earlier. The district court should have meaningfully considered

and addressed his primary argument that his sentencing took place 10 years after his participation in the RICO conspiracy ended, and since that time, he lacked criminal conduct connected to the gang, had extensive employment history, and had exited the gang.

Mr. Jimenez's sentence should also be vacated and remanded for resentencing, because he now qualifies for a reduced advisory sentence under the retroactive Amendment 821. At the time of sentencing, he received two "status points" pursuant to 4A1.1(d) that are no longer applicable, and without these two points, Mr. Jimenez's criminal history category would change from III to II. Because the Amendments took effect after Mr. Jimenez was sentenced, the district court never addressed this amendment.

Mr. Jimenez's sentence should be vacated and remanded, because the district court improperly included the Salgado shooting as a predicate act rather than counting it only as a prior sentence. According to U.S.S.G. § 2E1.1(a)(2), app. n.4, a special rule applies to racketeering conspiracies that would result in the Salgado shooting being counted only as criminal history points and not part of the instant offense. Therefore, the district court erred when it calculated the Salgado shooting as both a predicate offense and a prior sentence.

The district court erred when it used acquitted conduct to increase Mr. Jimenez's advisory sentencing guidelines. The use of acquitted conduct is

21

impermissible under the Due Process Clause of the Fifth Amendment and his right to a jury trial under the Sixth Amendment. The use of this acquitted conduct increased his advisory sentence and occurred prior to the issuance of the 2024 Guidelines.

Based on the errors raised, any error is not harmless, and this Court should vacate Mr. Jimenez's sentence and remand the case to the district court for resentencing. The district court did not consider or contemplate many of the issues raised on appeal. Therefore, Mr. Jimenez's arguments are not harmless and insulated from remand and further review. Any failure to correctly calculate the Guidelines constitutes procedural error, and the error most often will be sufficient to show a reasonable probability of a different outcome absent the error. Thus, a remand is appropriate in this case.

## ARGUMENTS

### I. Mr. Jimenez's sentence should be vacated and remanded for resentencing, because the district court failed to address his principal argument in mitigation.

#### A. Standard of Review

This Court applies *de novo* review to procedural challenges to a sentence. *United States v. Wilcher*, 91 F.4th 864, 869-70 (7th Cir. 2024). This Court assesses whether the district court committed any significant error, such as by failing to adequately explain a sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007).

#### B. Applicable Case Law

A sentencing court must consider each side's principal arguments in mitigation. *Rita v. United States*, 551 U.S. 338, 356 (2007); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). In determining whether a court addressed an argument, we consider the "totality of the record." *United States v. Poetz*, 582 F.3d 835, 839 (7th Cir. 2009) (holding that no error occurred because it was "apparent from th[e] record that the judge fully understood [the] argument ... and implicitly considered and rejected it in imposing a lenient, below-guidelines term of imprisonment"). The court must state its reasons for rejecting a defendant's principal arguments if the arguments have merit. *Cunningham*, 429 F.3d at 679 ("We cannot have much confidence in the judge's considered attention to the factors in this case, when

23

he passed over in silence the principal argument made by the defendant even though the argument was not so weak as not to merit discussion, as it would have been if anyone acquainted with the facts would have known without being told why the judge had not accepted the argument. . . . A judge who fails to mention a ground of recognized legal merit (provided it has a factual basis) is likely to have committed an error or oversight.").

### C. The district court should address Mr. Jimenez's principal argument in mitigation at resentencing.

Mr. Jimenez's sentence should be vacated and the case remanded to the district court for it to address Mr. Jimenez's principal argument in mitigation: that at his 2023 sentencing, Mr. Jimenez was a completely different person since leaving the gang in 2013. R. 1735: 15-19, 20; R. 2931: 35-37, SA 43-45. Mr. Jimenez's argument focused on his lack of criminal history, exit from the gang, and employment history.

Mr. Jimenez's criminal history only included three convictions: one for the 2003 Salgado shooting, one involving possession of .1 grams of cocaine from 2006, and a 2014 DUI. R. 1735: 18, 77-78 (lab found that substance was .1g of cocaine). R. 2894: 15-16. There was no evidence to suggest that the DUI had any connection to gang activity. "For Juan Jimenez the last ten years, from 2013 to today, July 2023 have not been meaningless. They show a growing awareness by Defendant that his life was on the wrong path and

that he had to make an about face." *Id.* at 20. "There was very little evidence, if any, beyond the 2007 accusation linking him to any criminal conduct." *Id.*

Mr. Jimenez pointed out that standing before the court in July 2023, he was not the same person who was a member of the Latin Kings years before. *Id.* at 16, 20. After his 2016 arrest in this case, he was released on bond and adhered to all conditions. *Id.* at 16. Mr. Jimenez also noted that this would be his first custodial sentence. *Id.* at 19. He noted,

> The government is right, defendants who have never had a custodial sentence, like Mr. Jimenez, are the least likely to commit further crimes and generally require a shorter term of incarceration to achieve the goal of specific deterrence; *i.e.*, to protect the public from further criminal activity of the defendant. *See United States v. Baker,* 445 F.3d 987, 991- 92 (7th Cir. 2006); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). *See also An Analysis of Non-Violent Drug Offenders with Minimal Criminal Histories,* U.S. Department of Justice, Executive Summary (February 4, 1994) (noting that shorter prison sentences can deter future criminal activity by defendants just as effectively as long prison sentences).

*Id.* at 19. Mr. Jimenez argued that his change demonstrated that he is no longer a danger to the community, and although he will serve significant time in prison, deterrence does not necessitate a sentence of 20 years. R. 2931: 37, SA 45.

He also demonstrated that he had maintained employment for years. From 2001 to 2006, he worked as an apprentice with Carpenters Union Local 434. R. 2894: 16. From 2007 until his arrest in 2016, he worked for a property

management company. *Id.* He lost this job following his arrest, and he started working at a fitness center and worked his way up to manager. *Id.* at 16-17. When the trial began, he had to quit his day job and started delivering newspapers in the morning and working as a doorman/valet on nights and weekends. *Id.* at 17. All of this was corroborated by letters submitted on his behalf. *Id.* Even while at the MCC, he completed multiple programs despite the COVID lockdowns. *Id.* at 17-18.

Although the court need not address every § 3553(a) factor at sentencing or respond to every minor argument raised by a defendant, the court must address "principal" ones that are "not so weak as to not merit discussion. *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009); *Cunningham*, 429 F.3d at 679. Here, like in *Villegas-Miranda*, even where the district court stated reasons for the sentence it imposed, the court was silent in response to Mr. Jimenez's principal argument made in both his sentencing memorandum and sentencing. R. 2931: 35-44; 2894: 15-19.

The district court's failure to even address Mr. Jimenez's argument cannot be harmless error, because this Court can never be sure of what effect it had, or could have had, on the court's decision. *Villegas-Miranda*, 579 F.3d at 802. Mr. Jimenez's argument regarding the change between 2003 to his exit from the gang in 2013 and his sentencing in 2023 "was not so weak as to not merit discussion." *Id.* Although a district court's treatment of a mitigation

26

argument "can be implicit or imprecise and does not need to be extensive," as long as this Court can recognize that the judge considered the argument. *United States v. Tounisi,* 900 F.3d 982, 987 (7th Cir. 2018). The district court committed a procedural error by not addressing Mr. Jimenez's principal argument in mitigation, and therefore, his sentence should be vacated and remanded for resentencing.

**II.    This matter should be vacated and remanded for resentencing because Mr. Jimenez qualifies for a reduction under Amendment 821 to the U.S. Sentencing Guidelines.**

### A. Standard of Review

This Court reviews *de novo* the district court's calculation and application of the guidelines range. *United States v. Prieto,* 85 F.4th 445, 448 (7th Cir. 2023).

### B. Mr. Jimenez qualifies for retroactive application of Amendment 821 pursuant to Amendment 825.

Mr. Jimenez was sentenced in July 2023 under the November 2018 version of the sentencing guidelines. R. 1735: 15, ¶50. Under this version of the guidelines, he received two criminal history "status points" under § 4A1.1(d) because he committed the instant offenses while on probation for possession of a controlled substance. *Id.* at 18, ¶71. These two points raised the number of his criminal history points from three to five and placed him in criminal history category III. *Id.* at 18, ¶72.

27

The November of 2023 version of the guidelines removed the automatic two status points under § 4A1.1(d) and revised it to add only one status point if the defendant received seven or more points under §§ 4A1.1(a) through (d). U.S.S.G., Amend. 821. Mr. Jimenez did not receive seven or more criminal history points, so under the 2023 version of the guidelines, he should not receive any status points. This change reduces his criminal history category to II rather than III. Amendment 825 made the changes to § 4A1.1(d) retroactive to defendants who had already been sentenced. U.S.S.G., Amend. 825. Mr. Jimenez was sentenced in July 2023, prior to the proposing of, adoption of, and retroactivity of the 2023 amendments. Therefore, Amendment 821 applies to him through the operation of Amendment 825.

### C. This Court should reverse and remand for resentencing.

This Court held that when a defendant with a pending appeal also qualifies for a retroactive amendment to the sentencing guidelines, this Court can order a resentencing under 28 U.S.C. § 2106. *Claybron*, 88 F.4th at 1231. Once the Court determined the defendant qualified for the retroactive amendment, the Court would remand "unless it was apparent from the sentencing hearing that the judge would have imposed the same sentence even if the amendment had been in force." *Id.* at 1230. This Court recently stated,

> Appellate courts have the authority to issue remands when 'just under the circumstances.' 28 U.S.C. § 2106. As we reasoned in *United States v. Claybron*, 88 F.4th 1226, 1230 (7th Cir. 2023), it is presumptively in the interest of justice to remand pursuant to 28 U.S.C. § 2106 when the district court had no opportunity to consider a retroactive amendment to the Sentencing Guidelines that reduces a defendant's recommended sentence.

*United States v. Easterling*, No. 23-1143, 2025 U.S. App. LEXIS 2376, at *5-6 (7th Cir. Feb. 3, 2025).

This Court noted in *Easterling* that ordinarily, if the district court makes an error in calculating the guidelines range, this Court remands for resentencing unless it is "apparent from the sentencing hearing that the judge would have imposed the same sentence even if the amendment had been in force." *Id.* at *6 (quoting *Claybron*, 88 F.4th at 1230). To avoid a remand, this Court requires an "unambiguous" statement by the judge to that effect, *United States v. Caraway*, 74 F.4th 466, 468 (7th Cir. 2023), and we must be able "to determine from the judge's explanation why the disputed issue would not have mattered." *United States v. Baker*, 56 F.4th 1128, 1132 (7th Cir. 2023). "But this typical practice is a poor fit for this case" where the court never had the opportunity to address the disputed issue. *Easterling*, 2025 U.S. App. LEXIS 2376, at *6. Like both *Claybron* and *Easterling*, Amendments 821 and 825 took effect after Mr. Jimenez was sentenced, and the district court never addressed this amendment or explained that it would

29

have imposed the same sentence even with the change in criminal history category.

The only mention applicable to a potential harmless error analysis at sentencing was the district court's statement related to the inclusion of acquitted conduct, specifically that even without it, his sentence would still be 240 months. R. 2931: 44; SA 52. Prior to this statement, the court also noted that it did not believe that the inclusion of the acquitted conduct was going to matter to the guideline calculation. R. 2931: 27; SA 35. However, for reasons explained below in section III, this statement is based on an incorrect calculation of the advisory guideline range.

In addition, the district court's statement did not contemplate a change in criminal history category. This Court "require[s] a district court to assure us that it would impose the same sentence again by specifically addressing the contested issue." *Easterling*, 2025 U.S. App. LEXIS 2376, at *8. "We will not presume that a district court is so intransient that nothing the Commission does and no possible change to the Guidelines could sway its prior decision." *Id*.

**III. The district court erred when it used the Salgado shooting as a predicate act rather than counting it only as a prior sentence.**

### A. Standard of Review

This Court reviews *de novo* the district court's application of the guidelines range calculation. *United States v. Prieto*, 85 F.4th at 448. "When interpreting a specific provision of the sentencing guidelines, we 'begin with the text of the provision and the plain meaning of the words in the text.'" *United States v. Cook*, 850 F.3d 328, 332 (7th Cir. 2017) (quoting *United States v. Hill*, 645 F.3d 900, 907-08 (7th Cir. 2011)).

### B. Because the Salgado shooting resulted in a conviction prior to the last overt act of the racketeering conspiracy, the predicate act should have only been counted as a prior sentence.

Mr. Jimenez was convicted of the racketeering conspiracy, so U.S.S.G. § 2E1.1 provided his offense level. R. 1735: 15. Under § 2E1.1(a)(2), Mr. Jimenez's base offense level was "the offense level applicable to the underlying racketeering activity." Application Note 4 contains a special rule in the case of racketeering conspiracies:

> Certain conduct may be charged in the count of conviction as part of a "pattern of racketeering activity" even though the defendant has previously been sentenced for that conduct. Where such previously imposed sentence resulted from a conviction prior to the last overt act of the instant offense, treat as a prior sentence under §4A1.2(a)(1) and not as part of the instant offense.

31

U.S.S.G. § 2E1.1, app. n.4 (2018). Where a prior sentence "resulted from a conviction prior to the last overt act of the instant offense," Application Note 4 specifically states that the predicate act should be counted as a prior sentence under U.S.S.G. § 4A1.2(a)(1) rather than part of the RICO offense. *Id.*; *see United States v. Watkins*, 107 F.4th 607, 635 (7th Cir. 2024); *United States v. De La Cruz*, 897 F.3d 841, 843 (7th Cir. 2018).

The rationale behind the rule is that in cases involving a lengthy conspiracy, if everything is treated as relevant conduct, a defendant could be left with no criminal history points. *Id.* ("This treatment is designed to produce a result consistent with the distinction between the instant offense and criminal history found throughout the guidelines"); *see Perez v. United States*, No. 13 C 4478, 2015 U.S. Dist. LEXIS 171543, at *39 (N.D. Ill. Dec. 22, 2015).

Here, the district court erred when it used the Salgado shooting as both a predicate offense and prior sentence. Mr. Jimenez argued repeatedly that the Salgado shooting was not a predicate act, because the shooting was not a part of the charged conspiracy, but the court disagreed. R. 2931: 6-13, SA 14-21; R. 2894: 2-4. The Court specifically found that Mr. Jimenez was a member of the Latin Kings at the time of the shooting. R. 2931: 11-13, SA 19-21. According to U.S.S.G. § 2E1.1, app. n.4, once the court found that Salgado

32

shooting was a predicate act, it should have only included it as a prior sentence.

In the Offense Conduct section of the PSR, Probation outlined the attempted murder of Fabian Salgado which occurred on November 3, 2003. R. 1735: 12. "As a result of this conduct, Jimenez was convicted in the Circuit Court of Cook County, Illinois, Case No. 03 C6 61458-01, on June 23, 2004, of aggravated unlawful use of a weapon/vehicle and was sentenced to two years' probation (see PART B)." *Id.* In the Offense Level Computation, Probation included the Salgado shooting as a predicate act, and pursuant to § 2E1.1(a)(2) & § 2A2.1(a)(1), increased his base offense level from a 19 to a 33. R. 1735: 15. In the criminal history section, this same conviction was given a criminal history point, pursuant to U.S.S.G. § 4A1.1(c). *Id.* at 17.

In both the government's version of the offense and its sentencing memo, it acknowledged that the Salgado shooting resulted in Mr. Jimenez being convicted of aggravated use of a weapon and sentenced to 2 years' probation. R. 1735: 45; R. 1766: 6. The government also included the transcripts of the proceedings demonstrated that Mr. Jimenez's conviction is based on this shooting. R. 1735: 57-69. There was no question that Mr. Jimenez had previously been sentenced for the Salgado shooting.

The inclusion of the Salgado shooting as both a predicate act and a prior sentence is error. The Guidelines state that in a racketeering

33

conspiracy, a previously imposed sentence resulting from a conviction that occurred during the conspiracy should be treated as a prior sentence under § 4A1.2(a)(1) and not as part of the instant offense. Therefore, the criminal history point should have been included but the Salgado shooting should not have been used to increase the base offense level.

Although Probation did not recommend using the acquitted conduct for the Cintron murder as a predicate act, the district court found otherwise. Thus, the court's calculation of Mr. Jimenez's offense level was driven by the Cintron murder, not the Salgado shooting. R. 2931: 25-27, 44; SA 33-35, 52. However, based on the inclusion of the Salgado shooting as relevant conduct, along with the other arguments presented, including the inclusion of additional criminal history points (section II) and the use of acquitted conduct at sentencing (section IV), Mr. Jimenez urges the Court to consider vacating his sentence to allow the district court to correct the advisory guidelines. *See* 28 U.S.C. § 2106.

34

**IV.  Use of acquitted conduct to enhance Mr. Jimenez's sentence is constitutionally impermissible under the Due Process Clause of the Fifth Amendment and his right to a jury trial under the Sixth Amendment.**

**A. Standard of Review**

This court reviews a defendant's constitutional challenge to his sentence *de novo. United States v. Robinson*, 62 F.4th 318, 320 (7th Cir. 2023).

**B. The district court improperly sentenced Mr. Jimenez based on acquitted conduct.**

Although Mr. Jimenez was acquitted of the murder of Cintron, the district court found that the government proved his participation in the murder by a preponderance of the evidence and used the murder to increase his base offense level from a 19 to 43. The Supreme Court held that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). Other cases in this circuit have followed this precedent, as they must. *See, e.g., United States v. McClinton*, 23 F.4th 732, 735 (7th Cir. 2022) (noting that sentencing courts may consider acquitted conduct provided that its findings are supported by a preponderance of the evidence).

But the Supreme Court has signaled that the practice of sentencing defendants based on acquitted conduct is disfavored. *See McClinton v. United*

35

*States*, 143 S. Ct. 2400, 2401 (2023) (Sotomayor, J., "respecting the denial of certiorari"). "As many jurists have noted, the use of acquitted conduct to increase a defendant's Sentencing Guidelines range raises important questions that go to the fairness and perceived fairness of the criminal justice system." *Id.* at 2401 & n.2 (collecting cases). And following the denial of certiorari in *McClinton*, the U.S. Sentencing Commission amended the guidelines to limit the use of conduct for which a defendant was criminally charged but acquitted in federal court, *see* U.S.S.G. App. C, Amend. 826 (Nov. 1, 2024). Relevant conduct no longer includes conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction. *See* U.S.S.G. § 1B1.3(c).

Notably, in *McClinton*, Justice Sotomayor cautioned that "the Court's denial of certiorari should not be misinterpreted" because the "Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted-conduct sentencing in the coming year," and "[i]f the Commission does not act expeditiously or chooses not to act," the Court "may need to take up the constitutional issues presented." 143 S. Ct. at 2403. Justices Kavanaugh, Gorsuch and Barrett collectively agreed: "The use of acquitted conduct to alter a defendant's Sentencing Guidelines range raises important questions." *Id.* But "[i]t is

36

appropriate for this Court to wait for the Sentencing Commission's determination before this Court decides whether to grant certiorari in a case involving the use of acquitted conduct." *Id.*

This case presents the unique situation of a defendant sentenced based on acquitted conduct prior to the issuance of the 2024 Guidelines.[2]  The Commission's decision not to decide the retroactivity of this amendment is problematic and makes this issue ripe for consideration. If this Court continues to rely on *Watts* to reject this argument, Mr. Jimenez's contention is not frivolous and must be preserved for Supreme Court review. *See Robinson*, 62 F.4th at 320-21. Understandably, regardless of increasing support, until the Supreme Court says otherwise, this Court must follow its precedent. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *Cross v. United States*, 892 F.3d 288, 303 (7th Cir. 2018) ("As a lower court, we are required to follow the Court's precedents until the Court itself tells us otherwise.").

### V.  Any error in calculating the guidelines is not harmless.

"Errors in calculating the advisory guideline range are subject to harmless error analysis." *United States v. Shelton*, 905 F.3d 1026, 1031 (7th Cir. 2018) (citing *Hill*, 645 F.3d at 906). A district court commits harmless

---

[2] Mr. Jimenez was sentenced in July 2023 under the 2018 U.S. Sentencing Guidelines. However, if this case is remanded for resentencing, the use of the Cintron murder would be limited under the advisory guidelines.

error when its sentencing error affects the defendant's substantial rights. *United States v. Abbas*, 560 F.3d 660, 667 (7th Cir. 2009). "Put another way, the government must be able to show that [the error] did not affect the district court's selection of the sentence imposed." *Id.* (internal citations omitted). This Court has "consistently concluded that where a district judge makes clear that he would have applied the same sentence irrespective of an auxiliary decision, any error in such a decision is harmless." *Id.*

Here, the district court sentenced Mr. Jimenez to 240 months' imprisonment, the guideline pursuant to offense level 46, CHC III. The only mention applicable to a harmless error analysis is the following statement by the district court: "The thing that I think is really critical to state here, though, because of the state of the law, even if I did not hold you responsible for the Cintron murder, I would still sentence you to 240 months, even if I didn't credit that factually." R. 2931: 44; SA 52. The district court was referring to its inclusion of the acquitted conduct involving the Cintron murder. A "conclusory comment tossed in for good measure" is not enough to make a guidelines error harmless. *Id*; *see also United States v. Loving*, 22 F.4th 630, 636 (7th Cir. 2022) ("[W]e cannot infer, based on the district court's terse comments about the sentencing factors under 18 U.S.C. § 3553(a) that the court believed a 71-month prison sentence would be appropriate regardless of the correct guideline range").

38

The district court's statement was based on its assumption that the guidelines were correctly calculated; but that was not the case. Cumulatively, the district court should resentence Mr. Jimenez based on Amendments 821 and 825, remove the Salgado shooting as a predicate act and count it only as a prior sentence, and not consider the acquitted conduct as relevant conduct. Thus, without the acquitted conduct (total offense level 46) and the Salgado shooting (total offense level 36), Mr. Jimenez's offense level would be a 22. U.S.S.G. §§ 2E1.1(a)(1), 3B1.1(b); R. 1735: 29, ¶134; R. 2931: 5, 25-27; SA 13, 33-35. Under Amendments 821 and 825, Mr. Jimenez's criminal history category decreases to II. An offense level 22, criminal history II, results in an advisory guideline range of 46-57 months' imprisonment rather than the calculated 240 months' range applied at sentencing. U.S.S.G. Ch. 5, pt. A.

"Failure to calculate the correct Guidelines range constitutes procedural error," *Peugh v. United States*, 569 U.S. 530, 537 (2013), and in general, this type of error is prejudicial. As the Court put it, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, *and most often will*, be sufficient to show a reasonable probability of a different outcome absent the error." *Rosales-Mireles v. United States,* 138 S. Ct. 1897, 1907 (2018) (emphasis added). Here, if the acquitted conduct is no longer included in the advisory guideline range, the district court would

39

be selecting its sentence from a very different starting point. Thus, any error cannot be harmless. *United States v. Asbury*, 27 F.4th 576, 582 (7th Cir. 2022); *United States v. Jett*, 982 F.3d 1072, 1078 (7th Cir. 2020).

## CONCLUSION

Based on the foregoing arguments, Mr. Jimenez respectfully requests that this Court vacate his sentence and remand it for resentencing.

Respectfully submitted,

*s/Hannah Valdez Garst*
*Counsel for Juan Jimenez*
Law Offices of Hannah Garst, P.C.
121 S. Wilke Rd., Ste. 301
Arlington Heights, IL 60005
773-248-6504
hannahgarst@garstlaw.com

40

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7), FED. R. APP. P. 32(g) and CIR. R. 32(c)

The undersigned, counsel of record for the Defendant-Appellant furnishes the following in compliance with Fed. R. App. P. 32(a)(7):

I hereby certify that this brief conforms to the rules contained in Fed. R. App. P. 32(a)(7) for a brief produced with a proportionally spaced font.

The length of this brief is 9,150 words.

*/s/ Hannah Valdez Garst*
Attorney for Defendant-Appellant
Law Offices of Hannah Garst, P.C.
121 S. Wilke Rd., Ste. 301
Arlington Heights, IL 60005
773-248-6504
hannahgarst@garstlaw.com


Dated: March 17, 2025

# PROOF OF SERVICE

The undersigned attorney hereby certifies that she has caused a copy of the foregoing to be filed with the Clerk of Court using the CM/ECF system and served, by the electronic filing system, upon all attorneys of record, on this 17th day of March, 2025.

*/s/Hannah Valdez Garst*

Attorney for Defendant-Appellant
Law Offices of Hannah Garst, P.C.
121 S. Wilke Rd., Ste. 301
Arlington Heights, IL 60005
773-248-6504
hannahgarst@garstlaw.com

No. 23-2462

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN J. JIMENEZ,

Defendant-Appellant.

_____

Appeal from Judgment in the United States District Court
for the Northern District of Illinois, Eastern Division.
District Court Case No. 1:16-cr-00463
The Honorable Virginia M. Kendall, Chief Judge.

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)**

Undersigned counsel hereby states and certifies that all the materials required by Circuit Rule 30(a) and 30(b) are included in the appendix to this brief.

> _s/Hannah Valdez Garst_
> Attorney for Juan Jimenez
> Law Offices of Hannah Garst, P.C.
> 121 S. Wilke Rd., Ste. 301
> Arlington Heights, IL 60005
> 773-248-6504
> hannahgarst@garstlaw.com

Dated: March 17, 2025

No. 23-2462

_____

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN J. JIMENEZ,

Defendant-Appellant.

Appeal from Judgment in the United States District Court
for the Northern District of Illinois, Eastern Division.
District Court Case No. 1:16-cr-00463
The Honorable Virginia M. Kendall, Chief Judge.

APPELLANT'S REQUIRED SHORT APPENDIX
_____

Hannah Valdez Garst
Attorney for Juan Jimenez
Law Offices of Hannah Garst, P.C.
121 S. Wilke Rd., Suite 301
Arlington Heights, IL 60005
(773) 248-6504
hannahgarst@garstlaw.com

# APPENDIX

R. 2910 (Judgment and Conviction) ......................................................... SA 1-8

R. 2931 (Sentencing Transcript) .............................................................. SA 9-58

# UNITED STATES DISTRICT COURT
Northern District of Illinois

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) ) | |
| JUAN JIMENEZ | ) ) | Case Number:　　1:16-CR-00463(2) |
| | ) ) | USM Number:　　51406-424 |
| | ) ) ) | |
| | ) ) | Michael B. Nash |
| | | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)　　　which was accepted by the court.

☒ was found guilty on count(s) 1ss of the Second Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| **Title & Section / Nature of Offense** | **Offense Ended** | **Count** |
|---|---|---|
| 18:1962-0100.F Murder, First Degree 18:2 Aiding & Abetting | 02/01/2018 | 1ss |

The defendant is sentenced as provided in pages 2 through 8 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count(s) remaining are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this District within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

July 26, 2023
Date of Imposition of Judgment

Signature of Judge

Virginia M. Kendall, United States District Judge

Name and Title of Judge

7/27/2023
Date

SA 1

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 2 – Imprisonment                                                  Judgment – Page 2 of 8

DEFENDANT:  JUAN JIMENEZ
CASE NUMBER:  1:16-CR-00463(2)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
Two hundred and forty (240) months as to count 1ss of the Second Superseding Indictment.

☒      The court makes the following recommendations to the Bureau of Prisons: that the defendant participate in the Residential Drug and

Alcohol Treatment Program (RDAP) while incarcerated. That the defendant be incarcerated at Oxford FCI.

☒      The defendant is remanded to the custody of the United States Marshal.

☐      The defendant shall surrender to the United States Marshal for this district:

☐          at          on

☐          as notified by the United States Marshal.

☐      The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐          before 2:00 pm on

☐          as notified by the United States Marshal.

☐          as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows: _____

_____

_____

Defendant delivered on _____ to _____ at_____, with a certified copy of this
judgment.

_____
UNITED STATES MARSHAL

By   _____
DEPUTY UNITED STATES MARSHAL

SA 2

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release

Judgment – Page 3 of 8

DEFENDANT:  JUAN JIMENEZ
CASE NUMBER:  1:16-CR-00463(2)

## MANDATORY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3583(d)

Upon release from imprisonment, you shall be on supervised release for a term of:
Three (3) years as to count 1ss of the Second Superseding Indictment.

The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall not commit another Federal, State, or local crime.

☒ (2) you shall not unlawfully possess a controlled substance.

☐ (3) you shall attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, if an approved program is readily available within a 50-mile radius of your legal residence. [Use for a first conviction of a domestic violence crime, as defined in **§ 3561(b)**.]

☐ (4) you shall register and comply with all requirements of the Sex Offender Registration and Notification Act **(42 U.S.C. § 16913)**.

☒ (5) you shall cooperate in the collection of a DNA sample if the collection of such a sample is required by law.

☒ (6) you shall refrain from any unlawful use of a controlled substance AND submit to one drug test within 15 days of release on supervised release and at least two periodic tests thereafter, up to 104 periodic tests for use of a controlled substance during each year of supervised release. [This mandatory condition may be ameliorated or suspended by the court for any defendant if reliable sentencing information indicates a low risk of future substance abuse by the defendant.]

## DISCRETIONARY CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C § 3563(b) AND 18 U.S.C § 3583(d)

**Discretionary Conditions** — The court orders that you abide by the following conditions during the term of supervised release because such conditions are reasonably related to the factors set forth in **§ 3553(a)(1)** and **(a)(2)(B), (C), and (D);** such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in **§ 3553 (a)(2) (B), (C), and (D)**; and such conditions are consistent with any pertinent policy statement issued by the Sentencing Commission pursuant to **28 U.S.C. 994a**.
The court imposes those conditions identified by checkmarks below:

**During the period of supervised release:**

☒ (1) you shall provide financial support to any dependents if you are financially able to do so.

☐ (2) you shall make restitution to a victim of the offense under **§ 3556** (but not subject to the limitation of **§ 3663(a)** or **§ 3663A(c)(1)(A)**).

☐ (3) you shall give to the victims of the offense notice pursuant to the provisions of **§ 3555**, as follows:

☒ (4) you shall seek, and work conscientiously at, lawful employment or, if you are not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

☐ (5) you shall refrain from engaging in the following occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense, or engage in the following specified occupation, business, or profession only to a stated degree or under stated circumstances; (if checked yes, please indicate restriction(s))

☒ (6) you shall not knowingly meet or communicate with any person whom you know to be engaged, or planning to be engaged, in criminal activity and shall not:
  ☐ visit the following type of places:
  ☐ knowingly meet or communicate with the following persons:

☒ (7) you shall refrain from ☐ any or ☒ excessive use of alcohol (defined as ☒ having a blood alcohol concentration greater than 0.08; or ☐          ), and from any use of a narcotic drug or other controlled substance, as defined in **§ 102** of the Controlled Substances Act (**21 U.S.C. § 802**), without a prescription by a licensed medical practitioner.

☒ (8) you shall not possess a firearm, destructive device, or other dangerous weapon.

☐ (9) ☐ you shall participate, at the direction of a probation officer, in a substance abuse treatment program, which may include urine testing up to a maximum of 104 tests per year.
  ☐ you shall participate, at the direction of a probation officer, in a mental health treatment program, and shall take any medications prescribed by the mental health treatment provider.
  ☐ you shall participate, at the direction of a probation officer, in medical care; (if checked yes, please specify:

SA 3

Case: 1:16-cr-00463 Document #: 2910 Filed: 07/27/23 Page 4 of 8 PageID #:23560

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release   Case: 23-2462   Document: 53   Filed: 03/17/2025   Pages: 111   Judgment – Page 4 of 8

DEFENDANT: JUAN JIMENEZ
CASE NUMBER: 1:16-CR-00463(2)

☐ (10) (intermittent confinement): you shall remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling ▢ [no more than the lesser of one year or the term of imprisonment authorized for the offense], during the first year of the term of supervised release (provided, however, that a condition set forth in **§3563(b)(10)** shall be imposed only for a violation of a condition of supervised release in accordance with **§ 3583(e)(2)** and only when facilities are available) for the following period ▢.

☐ (11) (community confinement): you shall reside at, or participate in the program of a community corrections facility (including a facility maintained or under contract to the Bureau of Prisons) for all or part of the term of supervised release, for a period of ▢ months.

☐ (12) you shall work in community service for ▢ hours as directed by a probation officer.

☐ (13) you shall reside in the following place or area: ▢, or refrain from residing in a specified place or area: ▢.

☒ (14) you shall not knowingly leave from the federal judicial district where you are being supervised, unless granted permission to leave by the court or a probation officer. The geographic area of the Northern District of Illinois currently consists of the Illinois counties of Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

☒ (15) you shall report to the probation office in the federal judicial district to which you are released within 72 hours of your release from imprisonment. You shall thereafter report to a probation officer at reasonable times as directed by the court or a probation officer.

☒ (16) ☒ you shall permit a probation officer to visit you ☒ at any reasonable time or ☐ as specified: ,
      ☒ at home        ☐ at work        ☐ at school        ☒ at a community service location
      ☒ other reasonable location specified by a probation officer
      ☒ you shall permit confiscation of any contraband observed in plain view of the probation officer.

☒ (17) you shall notify a probation officer within 72 hours, after becoming aware of any change in residence, employer, or workplace and, absent constitutional or other legal privilege, answer inquiries by a probation officer. You shall answer truthfully any inquiries by a probation officer, subject to any constitutional or other legal privilege.

☒ (18) you shall notify a probation officer within 72 hours if after being arrested, charged with a crime, or questioned by a law enforcement officer.

☐ (19) (home confinement)
      ☐ (a)(i) (home incarceration) for a period of __ months, you are restricted to your residence at all times except for medical necessities and court appearances or other activities specifically approved by the court.
      ☐ (a)(ii) (home detention) for a period of __ months, you are restricted to your residence at all times except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities pre-approved by the probation officer.
      ☐ (a)(iii) (curfew) for a period of __ months, you are restricted to your residence every day.
      ☐ from the times directed by the probation officer; or ☐ from __ to __.
      ☐ (b) your compliance with this condition, as well as other court-imposed conditions of supervision, shall be monitored by a form of location monitoring technology selected at the discretion of the probation officer, and you shall abide by all technology requirements.
      ☐ (c) you shall pay all or part of the cost of the location monitoring, at the daily contractual rate, if you are financially able to do so.

☐ (20) you shall comply with the terms of any court order or order of an administrative process pursuant to the law of a State, the District of Columbia, or any other possession or territory of the United States, requiring payments by you for the support and maintenance of a child or of a child and the parent with whom the child is living.

☐ (21) (deportation): you shall be surrendered to a duly authorized official of the Homeland Security Department for a determination on the issue of deportability by the appropriate authority in accordance with the laws under the Immigration and Nationality Act and the established implementing regulations. If ordered deported, you shall not remain in or enter the United States without obtaining, in advance, the express written consent of the United States Attorney General or the United States Secretary of the Department of Homeland Security.

☒ (22) you shall satisfy such other special conditions as ordered below.

☒ (23) You shall submit your person, property, house, residence, vehicle, papers [computers (as defined in 18 U.S.C. 1030(e)(1)), other electronic communications or data storage devices or media,] or office, to a search conducted by a United States Probation Officer(s). Failure to submit to a search may be grounds for revocation of release. You shall warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer(s) may conduct a search pursuant to this condition only when reasonable suspicion exists that you have violated a condition of your supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

SA 4

Case: 1:16-cr-00463 Document #: 2910 Filed: 07/27/23 Page 5 of 8 PageID #:23561

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release Case: 23-2462      Document: 53      Filed: 03/17/2025      Pages: 111    Judgment – Page 5 of 8

DEFENDANT:  JUAN JIMENEZ
CASE NUMBER:  1:16-CR-00463(2)

☐    (24)    Other:


## SPECIAL CONDITIONS OF SUPERVISED RELEASE PURSUANT TO 18 U.S.C. 3563(b)(22) and 3583(d)

The court imposes those conditions identified by checkmarks below:


**During the term of supervised release:**

☐    (1)    if you have not obtained a high school diploma or equivalent, you shall participate in a General Educational Development (GED) preparation course and seek to obtain a GED within the first year of supervision.

☒    (2)    you shall participate in an approved job skill-training program at the direction of a probation officer within the first 60 days of placement on supervision.

☒    (3)    you shall, if unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the probation office until gainfully employed. The total amount of community service required over your term of service shall not exceed 400 hours.

☐    (4)    you shall not maintain employment where you have access to other individual's personal information, including, but not limited to, Social Security numbers and credit card numbers (or money) unless approved by a probation officer.

☐    (5)    you shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless you are in compliance with the financial obligations imposed by this judgment.

☐    (6)    you shall provide a probation officer with access to any requested financial information requested by the probation officer to monitor compliance with conditions of supervised release.

☐    (7)    within 72 hours of any significant change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments, you must notify the probation officer of the change.

☐    (8)    you shall file accurate income tax returns and pay all taxes, interest, and penalties as required by law.

☐    (9)    you shall participate in a sex offender treatment program.  The specific program and provider will be determined by a probation officer. You shall comply with all recommended treatment which may include psychological and physiological testing. You shall maintain use of all prescribed medications.

   ☐    You shall comply with the requirements of the Computer and Internet Monitoring Program as administered by the United States Probation Office. You shall consent to the installation of computer monitoring software on all identified computers to which you have access and to which the probation officer has legitimate access by right or consent.  The software may restrict and/or record any and all activity on the computer, including the capture of keystrokes, application information, Internet use history, email correspondence, and chat conversations.  A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software. You shall not remove, tamper with, reverse engineer, or in any way circumvent the software.

   ☐    The cost of the monitoring shall be paid by you at the monthly contractual rate, if you are financially able, subject to satisfaction of other financial obligations imposed by this judgment.

   ☐    You shall not possess or use at any location (including your place of employment), any computer, external storage device, or any device with access to the Internet or any online computer service without the prior approval of a probation officer. This includes any Internet service provider, bulletin board system, or any other public or private network or email system

   ☐    You shall not possess any device that could be used for covert photography without the prior approval of a probation officer.

   ☐    You shall not view or possess child pornography. If the treatment provider determines that exposure to other sexually stimulating material may be detrimental to the treatment process, or that additional conditions are likely to assist the treatment process, such proposed conditions shall be promptly presented to the court, for a determination, pursuant to **18 U.S.C. § 3583(e)(2),** regarding whether to enlarge or otherwise modify the conditions of supervision to include conditions consistent with the recommendations of the treatment provider.

   ☐    You shall not, without the approval of a probation officer and treatment provider, engage in activities that will put you in unsupervised private contact with any person under the age of 18, and you shall not knowingly visit locations where persons under the age of 18 regularly congregate, including parks, schools, school bus stops, playgrounds, and childcare facilities. This condition does not apply to contact in the course of normal commercial business or unintentional incidental contact

   ☐    This condition does not apply to your family members:          [Names]

   ☐    Your employment shall be restricted to the judicial district and division where you reside or are supervised, unless approval is granted by a probation officer.  Prior to accepting any form of employment, you shall seek the approval of a probation officer, in order to allow the probation officer the opportunity to assess the level of risk to the community you will pose if employed in a particular capacity.  You shall not participate in any volunteer

SA 5

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 3 – Supervised Release                                                           Judgment – Page 6 of 8

DEFENDANT: JUAN JIMENEZ
CASE NUMBER: 1:16-CR-00463(2)

activity that may cause you to come into direct contact with children except under circumstances approved in advance by a probation officer and treatment provider.

☐     You shall provide the probation officer with copies of your telephone bills, all credit card statements/receipts, and any other financial information requested.

☐     You shall comply with all state and local laws pertaining to convicted sex offenders, including such laws that impose restrictions beyond those set forth in this order.

☐   (10)   you shall pay to the Clerk of the Court any financial obligation ordered herein that remains unpaid at the commencement of the term of supervised release, at a rate of not less than 10% of the total of your gross earnings minus federal and state income tax withholdings.

☒   (11)   you shall not enter into any agreement to act as an informer or special agent of a law enforcement agency without the prior permission of the court.

☐   (12)   you shall pay to the Clerk of the Court $_____ as repayment to the United States of government funds you received during the investigation of this offense. (The Clerk of the Court shall remit the funds to _____ (list both Agency and Address.)

☐   (13)   if the probation officer determines that you pose a risk to another person (including an organization or members of the community), the probation officer may require you to tell the person about the risk, and you must comply with that instruction. Such notification could include advising the person about your record of arrests and convictions and substance use. The probation officer may contact the person and confirm that you have told the person about the risk.

☐   (14)   You shall observe one Reentry Court session, as instructed by your probation officer.

☐   (15)   Other: _____

SA 6

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 5 – Criminal Monetary Penalties

DEFENDANT:  JUAN JIMENEZ
CASE NUMBER:  1:16-CR-00463(2)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $100.00 | $.00 | $.00 | $.00 | $.00 |

☐ The determination of restitution is deferred until        . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to **18 U.S.C. § 3664(i)**, all nonfederal victims must be paid before the United States is paid.

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant **to 18 U.S.C. § 3612(f)**. All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to **18 U.S.C. § 3612(g)**.

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the        .

☐ the interest requirement for the        is modified as follows:

☐ The defendant's non-exempt assets, if any, are subject to immediate execution to satisfy any outstanding restitution or fine obligations.

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SA 7

ILND 245B (Rev. 03/12/2020) Judgment in a Criminal Case
Sheet 6 – Schedule of Payments                                                                                                    Judgment – Page 8 of 8

DEFENDANT:  JUAN JIMENEZ
CASE NUMBER:  1:16-CR-00463(2)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**   ☒   Lump sum payment of $100.00 due immediately.

    ☐   balance due not later than          , or

    ☐   balance due in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

**B**   ☐   Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C**   ☐   Payment in equal        (*e.g. weekly, monthly, quarterly)* installments of $        over a period of        (*e.g., months or years)*, to commence        (*e.g., 30 or 60 days)* after the date of this judgment; or

**D**   ☐   Payment in equal        (*e.g. weekly, monthly, quarterly)* installments of $        over a period of        (*e.g., months or years)*, to commence        (*e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**   ☐   Payment during the term of supervised release will commence within        (*e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**   ☐   Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several<br>Amount | Corresponding Payee, if<br>Appropriate |
| --- | --- | --- | --- |

**See above for Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.**

☐   The defendant shall pay the cost of prosecution.

☐   The defendant shall pay the following court cost(s):

☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

SA 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Docket No. 16 CR 00463-2 |
| | ) | |
| Plaintiff, | ) | Chicago, Illinois |
| | ) | July 26, 2023 |
| v. | ) | 12:34 p.m. |
| | ) | |
| JUAN JIMENEZ, | ) | |
| | ) | |
| Defendant. | ) | |

TRANSCRIPT OF PROCEEDINGS - Sentencing
BEFORE THE HONORABLE VIRGINIA M. KENDALL

APPEARANCES:

| | |
|---|---|
| For the Government: | UNITED STATES ATTORNEY'S OFFICE by |
| | MS. ASHLEY AERI CHUNG |
| | Assistant United States Attorney |
| | 219 South Dearborn Street, 5th Floor |
| | Chicago, IL  60604 |
| | |
| For the Defendant: | MR. MICHAEL B. NASH |
| | 650 North Dearborn Street, Suite 700 |
| | Chicago, IL  60654 |
| | |
| Also Present: | MR. CRAIG BOUDY |
| | U.S. Probation Office |
| | |
| | |
| | |
| Court Reporter: | GAYLE A. McGUIGAN, CSR, RMR, CRR |
| | Official Court Reporter |
| | 219 S. Dearborn Street, Room 2504 |
| | Chicago, IL 60604 |
| | 312.435.6047 |
| | gayle_mcguigan@ilnd.uscourts.gov |

(In open court.)

(Defendant enters courtroom.)

THE CLERK:  16 CR 463, Defendant 2, U.S. versus Juan Jimenez.

MR. NASH:  Good morning, Judge.

THE COURT:  Good morning.

THE DEFENDANT:  Good morning.

THE COURT:  Good morning.

MS. CHUNG:  Good morning, your Honor.  Ashley Chung on behalf of the United States.

THE COURT:  Good morning.

MR. NASH:  Michael Nash for Mr. Jimenez.

THE COURT:  Good morning, Mr. Nash.

Good morning, Mr. Jimenez.

THE DEFENDANT:  Good morning.

PROBATION OFFICER:  Good afternoon, your Honor.  Craig Boudy on behalf of Annika Harris from Probation.

THE COURT:  You're the only one of us who had the time right.  Good afternoon.

And this was written by Mr. Freeze, right?

PROBATION OFFICER:  Yes, your Honor.

THE COURT:  So I guess you can't thank him.  He's gone, right?

PROBATION OFFICER:  He's retired, yes.

THE COURT:  Okay, so we'll let him retire, but thank

you for being here.

And thank you, Deputies.  Good afternoon.

COURT SECURITY OFFICER:  Judge.

THE COURT:  So here we are going to get started on this sentencing.

The way it works, Mr. Jimenez, is that we have to figure out a sentencing guideline range.  That's necessary before we look at the other factors.  We take that range, which is advisory in nature, and then we apply 3553 factors.  That's the number of the statute for sentencing.

We look to the seriousness of the offense, history and characteristics of you.  And I need to impose a sentence that prevents you from committing another crime, that's specific deterrence.  Prevents others from committing a like crime, that's general deterrence.  And I have to make sure that I impose a sentence that promotes respect for the rule of law.  And in your case also I need to make sure that I don't have any unwarranted sentencing disparities, because we have so many others that were sentenced within this group.

So all of those will be my considerations, as well as any personal, health, or other considerations regarding you.

So let's get started.

And, first, I'll ask Ms. Chung, do you have any factual changes you would like to make to the report?

MS. CHUNG:  Your Honor, just an update with respect to

the government's position as to the guidelines range here.

So first -- and this was already laid out in the government's written sentencing memorandum, which was filed a while ago --

THE COURT:  We'll go into the guidelines in a moment.

MS. CHUNG:  Okay.

THE COURT:  This is just a factual change.  Anything regarding the facts that were written?

MS. CHUNG:  No, your Honor.

THE COURT:  Anything factually?

MR. NASH:  No, Judge.

THE COURT:  So with that in mind, I'll adopt the report as written, and then we'll do the guideline calculation.

Go ahead now, Ms. Chung.

MS. CHUNG:  Thank you, your Honor.

So, first, the government does take the position here that among the predicate racketeering acts that apply in calculating Mr. Jimenez's guidelines range is also the murder of Isaias Cintron, which this Court heard testimony about at the trial back in 2019, and is -- was included as part of the charges against Mr. Jimenez at trial.

The jury ultimately acquitted him there; but in the government's view, that murder can be proven up by a preponderance of the evidence based on the evidence from trial.

In addition, I would just like to note that in the

government's view, under *United States versus Damico*, which I know is a case that your Honor is familiar with from all of the sentencings in this case, there is an adjustment as to, I believe, how the guidelines are calculated, although they do not affect the ultimate guideline sentence here.

In the government's view, because the murder of Isaias Cintron is one of the predicate racketeering acts, that has a base offense level of 43. In addition, there's also the attempted murder of Fabian Salgado, which is base offense level 33. As well as the conspiracy to commit murder as a member of the Latin Kings, which is also a base offense level 33.

In grouping those offenses, because the two acts that are at a 33 level are over nine levels lower than the 43, the government's view there is that then they would not count for additional units. We would be at a 43. And then under *Damico*, that a four-level leadership enhancement would apply to that 43, bringing us to 47.

Ultimately, in the government's view, that means that at that point Mr. Jimenez would actually be off the chart in terms of the sentencing table; but because of the 20-year statutory maximum here, regardless, his guidelines sentence is 240 months.

THE COURT: Got it, okay.

All right. So with that in mind, I assume that you're objecting to the Cintron murder, correct?

MR. NASH:  Yes, Judge.

THE COURT:  Are you objecting to the other guidelines calculation?

MR. NASH:  Yes, Judge.

THE COURT:  All right.  So then let's -- I'm trying to think of the best way to do this.

Give me your position first, and then we'll put on some -- are you going to put on evidence regarding it?

MS. CHUNG:  No, your Honor, just argument.

THE COURT:  Okay, very well.

Let's start with your position, Mr. Nash.

MR. NASH:  Judge, the offense level, the PSR talks about the Salgado shooting, and we've addressed that.  There's several reasons we don't see that that should be counted.

One, he was not a member of the Latin Kings at or about that time, according to the evidence at trial.

Two, according to police report offered by the government, that was a personal argument that he and his brother had with the people in the other car and was not a gang-related event.

Second -- third, that at that -- when he did join the Latin Kings, he joined the Dolton Region, and that was not part of the Southeast Region.  It was part of the Midwest Region.

For all those reasons, we don't believe the Salgado shooting is a predicate act and, therefore, should not be

counted and increase the offense level from 19 to 33, and the base level is 19.

THE COURT:  Let me just -- I think I missed one.

First, you said he wasn't a member of the gang at the time.

MR. NASH:  Correct.

THE COURT:  And then, lastly, you said he joined the Dolton Region, not the South Region.

So what -- was there one more point you mentioned?

MR. NASH:  It was, according to the police report, which the government introduced, it was a personal vendetta, not a gang event.

THE COURT:  Got it.  Thank you.

MR. NASH:  And they're all covered in my sentencing memorandum.

THE COURT:  Right.  Okay.

So let's stick with one predicate act at a time, so go ahead and respond to that.

MS. CHUNG:  Thank you, your Honor.

So the attempted murder of Fabian Salgado occurred in November of 2003, specifically November 3rd, in Blue Island, Illinois.

With respect to defendant's first argument that he was not a member of the gang in 2003, first of all, defendant's own statement to the FBI in January 2016 when he was arrested, in

that statement he said that he was a member of the Dolton Chapter of the Latin Kings beginning in approximately 2003. And that's also reflected in paragraph 22 of the PSR.

In addition, Alexander Vargas testified at trial about how -- he spoke specifically -- and this goes both with respect to the timing of defendant's gang membership as well as the, I believe it was the third argument that defense counsel mentioned with respect to the timing of when the Dolton Chapter became part of the Southeast Region.  Vargas testified at trial about his region getting restructured.  He specifically referred to a couple of extra chapters got dumped in my region, including Dolton, after they got stripped.  And in discussing that timing, he said that it was around 2003, because he recalled that he had taken over as Regional Inca in 2002, and that it was about a year into his tenure as a Regional Inca.

Just continuing there with respect to defendant's argument about the timing of when the Dolton Chapter joining the Southeast Region mattering as to whether the attempted murder of Fabian Salgado falls within the scope of the charged conspiracy, first, based on Vargas's testimony as well as defendant's own statements to the FBI, the government's position is that the evidence shows by a preponderance that, in fact, the Dolton Chapter was a part of the Southeast Region by 2003.

However, even if there were some factual issue as to

the timing of when that happened, as the government laid out in its response -- essentially, the same issue that has come up in the context of co-defendant Jose Jaramillo's sentencing -- the charged conspiracy here is not one that is limited to the Southeast Region as the gang defined itself at various points in time.

The conspiracy here charges that defendant was a member and associated with the Latin Kings street gang, which was an enterprise that had a national presence and a national scope.

The indictment discusses the structure of the gang as well, but ultimately charges that the conspiracy itself was, one, to promote the activities of the Latin Kings enterprise, which was a national enterprise reflected by a national Constitution, rules, codes, literature, et cetera, and also that, although the gang was structured into various geographic regions and chapters, ultimately that structure was the gang's own policing of how it -- how it ran itself, the fluidity of that gang structure, as reflected in the trial testimony, where multiple witnesses testified about how regions could expand or contract to encompass or exclude different chapters as they were stripped, as they broke down because of law enforcement actions, et cetera, and also how different chapters would coordinate and, for example, throw nation parties in order to raise funds for another chapter that might be struggling.

Here the scope of the charged conspiracy is one that is not limited to how the gang defined itself at a specific point in time.

Lastly, with regard to defendant's argument about the attempted shooting of Mr. Salgado being a result of personal animosity as opposed to being something relating to the gang, the police report that defense counsel cited, which is attached as Exhibit A to the government's version, in that report it states "He," Juan, referring to the defendant, "thinks that Fabian," who was one of the -- Fabian Salgado in the car, "is an SD," meaning Satan's Disciple, "and thought that other SD gang members were in the van, including Josh Taylor."

So although -- it then goes on to say "Juan and his brother have had problems with the SDs in the past." Here, given the timing and the fact that defendant was a member of the Latin Kings at this time, was a member of the Dolton Chapter, and then fired -- that he was driving that van, handed his gun to his passenger so that his passenger could fire on that van because they believed that there were rival gang members in this car, the government respectfully submits that this was a case -- a textbook case of the Latin Kings retaliating against a rival gang member and not something borne only out of personal animosity.

In addition, I'd just like to point the Court to additional trial testimony relating to the shooting of Mr. --

of Salgado where, for example, Bravo testified at trial about Jimenez telling him about being involved in a November 2003 shooting with him and another member of the Dolton Chapter, so it was two Latin Kings who were in this car firing on Satan's Disciples.

THE COURT:  Okay.  Would you like to reply to that?

MR. NASH:  Yes, Judge.

Two key words in the prosecution's presentation are "approximately" and "around."  And I don't think that carries the day as to when he joined the Latin Kings, as to whether the shooting took place within the realm of the timetable set out for the conspiracy.

And Bravo's statement is nothing more than he shot at some people that he had a grudge against, nothing more, and that's what the police report says.

THE COURT:  Okay. All right.  Based upon the trial testimony, I find that it was part of the conspiracy.

His own statement in his interview was that he became a member in 2003.  And, remember, this shooting is the end of 2003.  So he doesn't say, for example, you know, at the end of 2003, I became a member of the Dolton Latin Kings.

I do agree that the testimony at trial regarding the Dolton Chapter was that it had come into the Southeast Chapter through a number of different ways.  There was overlap between a number of the chapters, and Vargas did testify about that.

SA 19

He testified about, I don't know how he described it, but that he suddenly became responsible for a number of other chapters, including the Dolton Chapter.

So at the -- the most important thing to know about that, however, goes back to the indictment, which is that -- it doesn't limit it.  It doesn't say he's a part of a conspiracy of only the Southeast Region or he's part of a conspiracy of only the Dolton Latin Kings.  It says, instead, that he's part of a conspiracy of this national gang structure.

As far as it being a personal vendetta, I mean, there were a lot of personal vendettas couched within the gang vendettas.  The trial repeatedly showed me how much these rival gangs shot at each other and operated against each other.  And from the trial testimony, it was clear that there was a concern that there were Satan Disciples in that car, and the Satan Disciples in the car were the rival gang, and the rival gang is what they were operating against.

So even if he had some kind of personal vendetta with someone within the car, it coexisted and overlapped with the rival gang member being a Satan Disciple, and so I can't separate that rivalry from each other.  Instead, it just supports that there was this gang violence.

So I do find that the Salgado murder falls within the conspiracy, and that he was a member of the gang at the time, and that the fact that he joined the Dolton Region really does

SA 20

not matter because the Dolton Region was interchangeably used within the gang, and it really doesn't matter when it comes down to the indictment itself, which was being part of this national gang.

So that will be my factual findings for Salgado -- the predicate act for Salgado.

Now, what is the next predicate act that we -- is it Cintron?

MS. CHUNG:  I believe so, your Honor.

MR. NASH:  Yes.

THE COURT:  So this one he was acquitted of.  He was acquitted of this.

MR. NASH:  Yes, Judge.

THE COURT:  Right, okay.

And so let me hear from the government first.

MS. CHUNG:  Thank you, your Honor.

So, first, and as this Court is aware, Seventh Circuit and Supreme Court precedent are binding here and have found that there was no constitutional issue with using acquitted conduct at sentencing so long as it's proven by a preponderance of the evidence.  And I understand the argument that defendant and defense counsel have made is one to preserve that argument to the extent that that case law ends up overturned or superseded in the future.

THE COURT:  Which is possible from some of the things

SA 21

we're reading, right?

MS. CHUNG: Yes, your Honor. I believe the denial of cert. in the *McClinton* case in particular is the most recent instance of that.

Here the government submits that the murder of Isaias Cintron as well as defendant's participation in that murder was proven by a preponderance at trial.

As background, that murder occurred in January of 2007, and it was an instance where Latin Kings opened fire on Cintron as well as three others while they were in a car in Whiting, Indiana, outside of a bar.

As your Honor is aware, Isaias Cintron was not, in fact, a rival gang member. He was a former U.S. Marine. But the evidence at trial here shows that it was more likely than not that Jimenez was among the Latin Kings who were involved in that shooting.

This included testimony from two of the other witnesses who were with Mr. Cintron in that car at the time that they were fired upon, Mark Rodriguez and Vincente Hernandez. Both these witnesses testified about the sequence of events that night, including that they had met up with Mr. Cintron first at a different bar, Crowbar in Hammond, Indiana, then that they had driven to another Indiana bar in Cintron's car about 20 minutes away, which later testimony then filled in that that bar was McTavern's. And then they left for

Portside Pub, and it was in the Portside Pub parking lot of this third bar that gunshots erupted and that Cintron dove over the front passenger in the car, Mr. Hernandez, after Mr. Hernandez was hit, and that Mr. Cintron was shot multiple times and ultimately died from his wounds.

Your Honor also heard testimony from multiple members of the Hammond P.D. who talked about the forensic recovery of evidence at the scene of the shooting. And then there was a stipulation at trial that ballistic evidence showed that shell casings that were found at the site of the Cintron shooting matched casings from an AK-47 that was later recovered from Ivan Quiroz, who also testified at trial. And there was a stipulation that the cause of death of Mr. Cintron was obviously multiple gunshot wounds.

Then Mr. Quiroz testified at trial about how, around this time, there were multiple attempts to go to the McTavern's bar in Indiana in order to try to find Latin Dragons to retaliate against after they had been involved in the killing of a Latin King. He talked about how, during the first attempt, Quiroz had called the Inca from Dolton, Defendant Juan Jimenez's chapter, and asked for cars and drivers to go to McTavern's, that they ended up tailing a car that they believed was filled with Latin Dragons, but ultimately when they approached that car in a dark residential area at the time when they thought that they could carry out some act of violence, no

one was inside the car, so the first attempt was aborted.

THE COURT:  But you have to focus on Jimenez's role.

MS. CHUNG:  Yes, your Honor.  And, I apologize, I'm getting to that now.

THE COURT:  Oh, okay.

MS. CHUNG:  Then Quiroz testified about the second attempt, and this is where Jimenez comes into the picture.  He talks about how the following week, the week of the Cintron murder, Quiroz organized another attempt.  He again called the Inca from Dolton, and he requested the same drivers from the last time.  Ultimately, only one driver showed up, and Quiroz identified that driver by the name "Chinks," which is Mr. Jimenez's nickname.  They came in Jimenez's car, which was a four-door tinted Cadillac -- pardon me, tinted window Cadillac, which Quiroz recognized as Mr. Jimenez's car because he had seen him driving it -- he saw him driving it multiple times.  And also later on in January 2010, Ivan Quiroz testified that both his car as well as Mr. Jimenez's Cadillac were ticketed after they were together at an event.

So he sees Jimenez come.  Jimenez has two shooters in his car.  They go to this McTavern's bar.  And Quiroz testifies that he goes inside to try to scout to see if there are any Latin Dragons, and, meanwhile, he's communicating with Hiluterion Chavez, nicknamed Tails, who is outside of the bar in order to flag potential Latin Dragons to them using the

walkie-talkie function on their phones.  He then flags there's a group of guys coming out.  That ends up being Cintron's group.  Tails replies, "We're on it."  And then Quiroz departs. He later then sees Jimenez returning in his Cadillac with the two shooters in his car as well as -- and he -- pardon me, your Honor.  He had provided the AK-47 from the Pullman Chapter to the shooters in that car.

THE COURT:  Jimenez did?

MS. CHUNG:  No, your Honor, Quiroz provided that AK-47.

And, meanwhile, Tails returns driving a different car. And Quiroz testifies that he can't recall whether it was Tails specifically who told him what happened or whether it was the whole group as they returned, but what he learned was that they took care of it, that they had shot, that they believed everyone in the car was dead, and that later that same weekend, he heard that it was, in fact, an innocent person was killed.

Quiroz also testified that he took his AK-47 back and noticed that the clip, which had been full and had a 30-round capacity, felt much lighter.  And he testified at trial that he thought it had been emptied or, at the very least, that it felt much lighter.

And then, finally, he also testified about the fact that later on when Jimenez was considered and eventually promoted to become Regional Treasurer, part of the reason that

he was approved for that position was because Quiroz vouched for him based on the trust that he thought Mr. Jimenez had demonstrated by participating in the shooting and then staying quiet about it.  And Quiroz had specifically testified at trial that at the time of the Cintron murder, after Jimenez came back in his Cadillac with those two shooters in a car, Quiroz specifically remembered telling Mr. Jimenez, "Say nothing about this," and that Mr. Jimenez nodded and said something along the lines of "I got you."

Now, Mr. Quiroz's testimony is corroborated not only by the ballistic evidence that I mentioned showing AK-47 casings at the shooting, but also by Alexander Vargas' testimony.

Vargas testified at trial about McTavern's being ID'd as the target bar of a rival gang.  Now, Vargas referred to the Latin Counts instead of the Latin Dragons.  But here in the government's view, that could be an error as to which rival gang he was remembering.  Ultimately, the overall facts of what Mr. Vargas testified to are inconsistent with -- are consistent, pardon me, with what Quiroz testified to.

He talked about there were -- Quiroz going inside, trying to verify that there were rival gang members in there and to kill them in retaliation, and then he talks about how Quiroz had been inside, that Tails had been outside, that they had been using the walkie-talkie feature on the phone, and that

SA 26

they later said that they completed the mission, killed rival gang members, et cetera, and that the next day, Vargas met up with Tails, and that Tails told Vargas that they couldn't carry out the shooting right outside of McTavern's because there had been police present, so that's why they had followed the car to another bar.

And then, third, Bravo also testified at trial about this shooting, and he testified that Jimenez told him that he had been involved in a shooting with Quiroz at a bar in Indiana.

Now, defense counsel in their written submission claims that this -- tries to minimize this corroborative testimony saying that Quiroz was involved in several shootings at Indiana bars. However, the facts that Bravo testified to were that Jimenez specifically testified to scouting bars in Indiana in order to look for Latin Dragon hang-outs, that Jimenez told Bravo that he had scouted a bar in Indiana with Quiroz and that people had looked like Latin Dragons in there, and then also later on, after a 2010 indictment came down under Mr. -- against Mr. Quiroz, that Jimenez told Bravo that he was worried because he had done a shooting with Mr. Quiroz in Indiana in his Cadillac where he had been the driver.

And the government submits that particularly here on a preponderance standard, all of this corroborative trial testimony as well as the ballistic evidence meet -- meet the

SA 27

standard.

And, lastly, I'd just like to note to the Court that in some ways the evidence that we have here is comparable to the evidence of the Serratos murder in which -- again, that was one that defendant Thomas Luczak was involved in, that he was acquitted of at trial, and that this Court, nevertheless, found that he had committed, by a preponderance standard at sentencing, where there we had trial testimony from Salazar plus forensic evidence from the crime scene showing that the bullet matched a gun that Salazar had handed to Luczak.  Here again we have trial testimony as well as corroborative ballistic evidence.

THE COURT:  Okay.  Mr. Nash?

MR. NASH:  First of all, we would ask your Honor to honor the jury's verdict.  I understand what the state of the law is.  I understand the Supreme Court has denied cert.  But the opinions there certainly raised the questions as to how this might affect acquitted conduct in the setting of applying the guidelines, especially Sotomayor's comment, and the inability of Justices Breyer and Scalia to agree on what the guidelines mean and how they should be calculated many years ago in *Watts*.

There's also a natural, I use the word skiddidish, and I referred --

THE COURT:  Natural what?

MR. NASH: Skittiness -- skittishness --

THE COURT: Skittishness.

MR. NASH: -- skittishness of sentencing or punishing somebody who has been acquitted of the crime. And I invoke the memories of our forefathers, the founders, colonists at the time that they would have been appalled that the sovereigns, the magistrate -- your Honor, in this case -- would decide that a man should be punished as opposed to a jury.

I know the state of the law, as I say, but the new guidelines do take effect I think in November.

Second of all, there is I think inefficient -- insufficient evidence, even given the preponderance test. Much of what the prosecutor has spoken about is -- has nothing to do with Mr. Jimenez.

The only one that testified about Mr. Jimenez's involvement from a personal standpoint is Quiroz. How do I say that? Quiroz?

THE DEFENDANT: Quiroz.

MR. NASH: Quiroz. And he testified at another trial that "Chinks," which is the name he knows him by, was the shooter, not the driver. That's a big difference. That's just not a mistake. And the government passes --

THE COURT: But regardless of whether he was the driver or not, if there's sufficient evidence that he was part of the shooting, it wouldn't change the guidelines, right?

Like if he was the driver bringing the shooters or whether he was the actual shooter?

MR. NASH:  No, it wouldn't, but it would certainly change --

THE COURT:  Change his credibility.

MR. NASH:  -- the credibility of Quiroz.

THE COURT:  Okay.

MR. NASH:  One time he says he's the shooter, another time --

THE COURT:  Yes.

MR. NASH:  -- he says that he's the driver.

THE COURT:  What about Bravo, though?  Bravo testified that he made statements to him.

MR. NASH:  Bravo's statement is very interesting.  He says a shooting with Quiroz in Indiana.  And then he named the three towns in Indiana where the shooting -- he remembers it took place in one of them.  And he says Whiting, Hessville, and Hegewisch.  Hegewisch is not in --

THE COURT:  No.  South side, yeah.

MR. NASH:  South side.

So that's another point against his credibility -- or against Bravo, what he's talking about.

Also the great difference is in Latin and Counts.  They dismiss it as meaning nothing.  But Vargas is talking about shooting Latin Counts, and he's talking about Latin

Dragons. That's not something we can just dismiss. When Quiroz is talking to Vargas, he says they did it. And then Vargas says to Quiroz, who do you mean by -- the prosecutor asks him, who did he mean by "they"? And he says Quiroz and Tails. He doesn't name the defendant. He doesn't name him.

And then the next day, Vargas tells him -- or Tails calls him and tells him that he and Quiroz did the shooting. He doesn't name Jimenez.

And then last of all, the testimony of Hernandez and Rodriguez, the two witnesses that were in Cintron's car, they say that it happened immediately, that the shooters appeared to be in waiting for them.

That's not the way it was described by the government or their theory. Their theory was that they had to go down to 115th Street, which is about a quarter or a little less than a block, take a left-hand turn, stop by the alley, get out of the car, and run to the parking lot. That's not somebody who is there in waiting. And that's what the two eyewitnesses said.

So there are a lot of differences that make us pause and think. And I don't think that that carries the day, even under preponderance of the evidence.

THE COURT: What about the statement to me, which is one of the more powerful statements, where, according to Bravo, your client said to him he was worried about that Quiroz's indictment, because he was worried that Quiroz might cooperate

and talk about him being part of that murder?

MR. NASH:  Well, that's where he says the reason he's supposedly afraid of him, according to Bravo, is that he was at the shooting in Indiana.  But when they asked Bravo about where in Indiana, he says a place in Illinois and a different place, Hessville, and also Whiting.  And also Quiroz is involved in several murders in Indiana.  So whether he's talking about something else entirely, you can't -- you can't sentence him for the predicate act of the Cintron murder if it's not the Cintron murder but some other shooting, which is possible when you take his statement at face value.

THE COURT:  Okay.  Reply -- oh, I'm sorry.  I thought you were done.

MR. NASH:  And there's a small difference in what the government says -- Quiroz says he remains in the bar for about an hour, hour and a half, and he calls up to say that he can't see any of the bad guys in the bar.  And Tails says, oh, don't worry, we're on to it.

And so that's a difference in what Tails says and what Quiroz says.  And I think it affects both of their credibility.

And, more important, they're -- just their reliability.

MS. CHUNG:  Your Honor, very briefly.

I'll just note that the murder of Isaiah Cintron did take place in Whiting, Indiana, which is the third Indiana

location that Bravo testified that Mr. Jimenez had mentioned, and that also -- and is also consistent with the testimony of the witnesses who were in the car with Mr. Cintron who testified at trial.

With respect to the timing of whether they were waiting in the parking lot versus approached, I think the testimony of the witnesses, if I'm recalling correctly at trial, was that it seemed like the gunshots erupted very quickly. However, Mark Rodriguez also testified that they pulled into the parking lot pretty slowly because they had notice that there were only a few cars there and were trying to decide then whether they should go to a different location.

So I think that, in conjunction with all of the other corroborative testimony here, including, for example, that Bravo specifically referred to not only this involvement with a shooting -- Mr. Jimenez talking about doing the shooting with Quiroz in Indiana, but specifically having scouted in bars in Indiana in order to carry out that shooting and that he had been the driver, that here it meets the preponderance of the evidence standard.

THE COURT:  I think it's probably the saddest piece of testimony and evidence that came in in the trial, was to see that that young man was essentially assassinated on the street. It was just really horrible, horrible testimony.

This murder, ironically, because of your -- your cap

with the guidelines, it's not going to have too much of an impact even as far as the guideline calculation.  But one thing that it will have an impact on is on the families of those -- the family members of Isaias Cintron who lost their son that day and their loved one that day.

I think the evidence is more than sufficient to show by a preponderance of the evidence that he participated in the murder.

Well, the one thing we don't have is we don't have the actual shooting -- we don't have an eyewitness saying "This is who put the gun out the window," but it really doesn't matter.  What we know is that it was Jimenez's car.  We know that they requested the same driver, "Chinks."  We know that Jimenez showed up with it.  That's from Quiroz's testimony.  We know that Vargas described very similarly what had happened that day.

But to me the real strong testimony came from Bravo.  It came from Bravo saying that Jimenez admitted to scouting those bars, admitted that he was going to get in trouble after the Quiroz indictment.  He was concerned about the fact that Quiroz knew that he had done it and Quiroz told him not to talk about it, keep it between us.  We have the matching shell casings.  It's all circumstantial, but circumstantial evidence is the same.  Except for the statements, except for Bravo's statements to him, that's not circumstantial evidence.

SA 34

And so I don't think this is going to matter in the guideline calculation; but by a preponderance of the evidence, I do believe that you participated in the murder of Isaias Cintron.

And so as far as the second predicate act there, it will be attributed to you.

So the next thing we look to is acceptance of -- oh, attempted murder.  We have one more.

MR. NASH:  Organizer/leader, Judge.

THE COURT:  Oh, organizer/leader.  Okay.

So let me hear from the government.

MS. CHUNG:  Thank you, your Honor.

Here the evidence at trial established that Mr. Jimenez was a Regional Treasurer from approximately early 2007 through around 2014.  And, for example, Vargas testified about the Regional Treasurer's duties, including being in charge of collecting money from each chapter, testing different Latin Kings on their knowledge of the gang's rules, Constitution and literature, and specifically Vargas testified about how Mr. Jimenez was made a second Regional Treasurer for the Southeast Region because it had gotten so big.  And he talked about how Mr. Jimenez was then promoted to the same duties as the other Regional Treasurer, Diablo, how they collected money, how they passed out drugs, they bought guns. They reported on who failed those tests of Latin King

literature and needed to be fined. They advised on what chapters needed a break or needed guns, et cetera. And here throughout the course of this case and throughout the sentencings of the many co-defendants, this Court has consistently applied a three-level "manager or supervisor" enhancement for members of chapter leadership and the four-level "leader and organizer" enhancement for those folks who were higher up in the supervisory regional leadership role. And here not only is -- would applying the four-level enhancement make sense here with respect to his other co-defendants, but it's also specifically supported by the various trial testimony that came in.

And just to note a few other, other than Vargas's testimony, in addition, Chavez testified about Chinks being the Regional Treasurer, collecting dues from each chapter in the region and specifically recalled dropping money off from Raul Cavillo to Mr. Jimenez and Mr. Jimenez commenting that they were short. Salazar also testified about delivering chapter dues four to five times. Zambrano also testified at trial about how Chinks had notified him about chapters not paying dues, about how they discussed regional business, and how Chinks even tested Zambrano about his knowledge of Latin Kings literature. And as your Honor may recall, there were also a number of audio recordings that were placed into evidence at trial that included, for example, recordings where other Latin

SA 36

Kings referred to Mr. Jimenez as the landlord who needed to collect the money.

THE COURT:  Okay.  Response?

MR. NASH:  Judge, there's much about titles.  There's nothing about him organizing anything, directing anybody.  They spoke about him collecting dues, but that's not organizing or leading.  So I think, at best, the government gets three points.  But we suggest that those are all titles and it is -- the government -- he should -- that no one enhancement should apply.

THE COURT:  I agree with Mr. Freeze's assessment that the three-level enhancement should apply.

There was plenty of testimony regarding his collection of dues from the chapters and the finances, but there certainly were others that were directing and calling the shots, literally and figuratively here.

So I'm going to give him the three levels as not being the leader/organizer but being a leader/organizer -- or manager/supervisor.

So that means we are at what level right now?

MS. CHUNG:  Your Honor, I believe we would be at 46, because we would have the 43 from the Isaias Cintron murder, the two 33s for the attempted murder of Salgado, and conspiracy to commit murder would drop out because of the difference between them and the 43, and then we would add three for the

leadership enhancement, bringing us to 46.

THE COURT: We're at 46. And of course that's off the guideline chart, as anything over 43 is life. And so you have, however, a cap because the statutory authorized sentence of 20 years is less than the maximum guideline range. And, therefore, the guideline range ends up being 235 months to 240 months under guideline 5G1.1(c)(1).

MS. CHUNG: Your Honor, my apologies for interrupting. I believe it's 240 months --

THE COURT: Just 240 --

MS. CHUNG: Just 240, your Honor. I think your Honor was referring to the PSR's estimate --

THE COURT: I am.

MS. CHUNG: -- which that one did not include the 43 for the Isaias Cintron murder.

THE COURT: That's right. Okay, thank you. So the 240.

Now, with that in mind, go to the 3553 factors, Ms. Chung, and we'll go from there.

MS. CHUNG: Thank you, your Honor.

So beginning with the nature and circumstance of the offense, I won't belabor it. I know your Honor is very familiar with what the Latin Kings gang is and what the Latin Kings gang has done in various Chicago and Northwest Indiana communities in this case for decades at this point. And that

is a culture of senseless violence, both within the gang itself as well as throughout the communities in which the gang operates.  It involves numerous shootings, drug trafficking, witness intimidation, and other acts of violence and criminal activity that ultimately deteriorate the fabric of communities, undercut people's sense of safety in their own homes and neighborhoods, and promote a culture of fear, violence, and senseless death and injury across -- across the Chicagoland area, across the Northern District of Illinois, and even across the state borders into Indiana.

And so the effect that the street gang has had in Chicago is obviously expansive and, to put it bluntly, terrible.  And here Mr. Jimenez's role in the gang is one that is fraught with specific acts of violence, including this murder of Isaias Cintron, which is a heartbreaking murder, both -- and not only because he was an innocent victim, like many victims of the violence that arise from gang warfare are, but also because Cintron, in fact, was killed because he was trying to protect his friend who was in the car and had been hit and called it out.

In addition, we have the cold-blooded attempt to murder Fabian Salgado and his friend because they are -- they were believed to be rival gang members in Satan's Disciples.

We have decades of drug trafficking.

We have Mr. Jimenez's participation in discussing

witness intimidation and discussing the need to kill Chavez who was cooperating against the Latin Kings.

And also the leadership role that he had as a Regional Treasurer in the Southeast Region, as someone who was testing people on their adherence and knowledge of Latin Kings' rules, as the person who was controlling the distribution of funds, the collection of dues, and the use of those funds specifically to purchase guns to then be used in additional violence and additional gang warfare in different chapters.

So here the nature and circumstances of the offense, frankly, cannot be more serious.

With respect to defendant's history and personal characteristics, as the government noted in its written memorandum here relative to other co-defendants and relative to other gang defendants, Jimenez's background is somewhat notable for a relative lack of mitigating evidence.

He had opportunities to pursue a law-abiding life. He has notable family support, which is also reflected in the letters that were submitted to this Court. He had a generally good childhood in a quiet and friendly community in Blue Island. Did not suffer physical or mental health issues. And also had a history of employment, lawful employment. And despite all of that, he opted into the gang when he was 20, and then stayed in the gang for over a decade until he was in his early 30s. He chose that life time and time again. He did so,

even after garnering two prior criminal convictions for possession of controlled substances and relating to the attempted murder of Fabian Salgado, where both times he was cut a break, essentially, and sentenced to only two years' probation.  And on the second occasion, he was even told by the judge in Cook County Court that he was getting lucky, that not every judge would necessarily give him another second chance.  And, nonetheless, he continued to be a part of the gang, continued to participate in its leadership and direction, and continued to contribute to this culture of violence across the city.

Here the government also notes that a significant sentence is necessary, not only to protect the public from Mr. Jimenez and specifically deter him, as his other prior sentences did not, but also to generally deter others.  And that's -- general deterrence is obviously a factor that is specifically recognized under the statute.  It's one that the case law in the Seventh Circuit also recognize -- recognizes as being promoted by imposing more significant sentences.

With respect to avoiding unwarranted sentencing disparities, the government submits here that the 240-month guideline sentence is one that, by nature of being the guideline sentence, will help to mitigate unwarranted sentencing disparities, and also that within the case it's consistent with two of his co-defendants who the government

believes are at least somewhat comparable to Mr. Jimenez.

These include Carlos Padilla, whose guidelines range was estimated to be approximately 235 to 293 months. He had a higher statutory maximum of 480 months, and he was ultimately sentenced by this Court to 235 months. And Mr. Padilla was also part of regional leadership. He was a Regional Enforcer. He was also a Chapter Inca. He had joined the gang in 1996 and had a long-time gang membership like Mr. Jimenez, and was also involved in witness intimidation with respect to Mr. Chavez.

Similarly, Ricardo Denava, who was sentenced to 200 months -- and I believe his guidelines range was 240 months capped at the statutory maximum. He, like Mr. Jimenez, had over a decade in the gang. For Mr. Denava, it was 13 years. He had been a Chapter Inca and also held a regional leadership role as Regional Enforcer. And he also directed a retaliatory shooting against rival gang members, there the Spanish Vice Lords, and was involved in the witness intimidation against Mr. Chavez.

In his written submission, defense counsel tries to compare Mr. Jimenez to Edulio Cano. Edulio Cano was sentenced by this Court to 132 months, which was below the low end of his guidelines range of 168 to 210 months. However, Edulio Cano, although he was a Regional Inca, he had a lower criminal history than Mr. Jimenez. He was only criminal history category II, which arose from one prior conviction. And his

SA 42

base offense level was only 33.  And although defense counsel tries to draw a parallel claiming that Cano was involved in the murder of two Latin Dragons in the Soprano's parking lot, in fact, the testimony at trial that came in from Mr. Quiroz was that Cano had recruited -- attempted to recruit a driver in order to participate in that shooting, but ultimately that driver had been involved in an accident, had not been able to participate in the shooting, and that that shooting then proceeded without Cano's driver.  And so here in Cano's case, he was not actively participating at that point.  It wasn't -- obviously wasn't by virtue of not trying.  He still conspired to commit that murder.  But he was not, unlike Mr. Jimenez, he was not directly involved in that shooting.

And so in the government's view, here a 240-month sentence makes sense under all of the 3553(a) factors.

THE COURT:  Okay.  Thank you.

Mr. Nash?

MR. NASH:  Well, Judge, much of what the prosecutor talks about is what occurred long before -- or long ago.

I have a question here before me, who is the Juan Jimenez that stands before you?  And he's not the same man that was a member of the Latin Kings for a long time.  He's a different person.  And that change did not come by virtue of what Catholics call imperfect contrition.  It was more or less perfect contrition.  He understood that that life was not good,

and that a life of work and family is what should be achieved, and he began to change his life long before he came before your Honor, before this indictment. Even if we take what he told the FBI, he left them, the Latin Kings, in 2013. And he put into real work, into effort, changing what his life would be.

You saw the employment record there. It's long and would be envious for anybody, whether standing in the well of this court or not.

Your Honor has to take into account the things that you mentioned: Deterrence, respect for the law, just punishment, taking into account the family of those that the Latin Kings have abused over the years. But the man that stands before you is not the man that committed those acts. He's somebody different.

We're seven years almost to the day when he was arrested in this court -- or arrested for this indictment. During that time, he was on bail. He performed well, as a good citizen would. He maintained his employment such that when he had to quit his job working during the day -- he had two jobs, during the night and in the morning when the trial was going on. He had to leave his job at the realty firm when he was indicted, but he didn't sit back and feel bad for himself. He went out and got another job, a good job, where he eventually became a manager and started to achieve something in life.

So for a long period of time before this day, he's

tried to act as a responsible citizen. Those years, from 2013, '14, to today, he's conducted himself well and proven the Court -- to the Court that, number one, he's no longer a danger to the community. He's already spent four years in jail and will undoubtedly spend some more. But deterrence doesn't have to be a sentence of 20 years. And protecting the public, he's shown by his conduct that the public is not in danger from Juan Jimenez going forward.

As I say, these changes occurred beforehand.

I think that Mr. Cano is a good subject for comparison. He was a member of the Latin Kings much longer than Mr. Jimenez. Where Mr. Jimenez stepped back from the Latin Kings and got a job and worked for the time period that Mr. Cano was the Regional Inca, he was actively involved and chose to be involved in all Latin King affairs. That's not the case with Mr. Jimenez. It's a stark difference. And I think that that is a good point to make. He has a job coming out of prison.

So we would submit that a sentence below the maximum of the guidelines as your Honor has outlined it is appropriate.

THE COURT: Thank you.

Mr. Jimenez --

MR. NASH: One other point I would mention.

THE COURT: Oh, yes.

MR. NASH: This will be his first sentence in custody.

That makes a difference.  It has a greater impact.  So I think your Honor should take that into consideration also.

THE COURT:  Thank you.

Mr. Jimenez, before I sentence you, you do have the right to address the Court.  Do you want to say something?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

THE DEFENDANT:  I believe you have a copy of this as well.

THE COURT:  Yes, I do.

THE DEFENDANT:  Your Honor, thank you for allowing me the opportunity to speak today.  I have contemplated this moment for the past four years, if I should speak or keep silent.  But as time passed, the more my heart compelled me to speak.

First, I want to thank my family and my loved ones for being by my side during this hardship, and I am grateful for all their support.  I love every single one of you.

I can stand here and try to justify my previous lifestyle, behaviors, or demented actions.  The reality is that my way was wrong, and I take responsibility for where I am in this point in my life.  I can't blame anyone else but myself. I lived a past life with an ignorance, lack of integrity and maturity.  I chose to waste it all away on things that held no real significance.

It came to a point that I stood alone and repented. I asked God to remove the rubbish in my life, and in 2016 I was indicted, which today marks seven years.

In that moment, my life changed drastically. God removed the rubbish out of my life. Even though it brought me to this bad place, it had brought me to a closer relationship with our Lord.

As I stated earlier, I am grateful for my family because they will be a big part of my support returning to society. I have my beautiful wife that has been able to upkeep our home, and I have to -- a place to come home. I also have cousins and an uncle waiting to open their doors of their companies and offer me a job to get back on my feet and contribute to the household.

This is my goal immediately after my release. My goal within a year of my release is to get with a youth program and share my testimony with them. I have tried to reach out to some already with the help of my family, but, unfortunately, I haven't had any success yet.

My goal within five years is to start my own youth program in my own community and be able to expand it as time goes on. Eventually, I would love to speak to the youth in detention centers and schools.

I know it will be a challenge; but with the right resources and God guiding me along the way, I know I will

accomplish all this.

Lastly, my past -- my past doesn't determine who I am, nor dictate my future.  My past may be full of things I am not too proud of; but, with God's mercy, I'll walk in a new path and in His purpose for my life.  He gave me another opportunity in life.  And I pray that you take into consideration the new me and have mercy on me.

Thank you, your Honor.

And may God bless all of you.

THE COURT:  Thank you.

Okay.  Now it is time to impose sentence.

And we first start out with the nature and circumstances of the offense.

MR. NASH:  Your Honor, do you mind if I sit down?

THE COURT:  Oh, no, that's fine.

MR. NASH:  Thank you.

THE COURT:  Do you want him to sit with you?

MR. NASH:  No, whatever --

THE COURT:  Okay.

MR. NASH:  Do you want to sit down?

THE DEFENDANT:  I'm fine.

THE COURT:  All right.  So this is an extremely serious offense and such a senseless one.  To sit through the trial, to sit through all of these sentencing papers and all of the letters, it's so senseless, everything about it.  Young

people coming together to just wreak havoc on a community, so that good, law-abiding citizens are afraid to get out of their houses, testimony that was shared at trial about people running down the street and hoping to get into a home before bullets fly.  Just terrifying, just a terrifying way to live.  And all of those people didn't deserve to live in this community in that way.

There was not only constant gunfire, but this sense of retaliation.  For what?  For no reason.  Right?  Oh, there's somebody from the Dragons, there's somebody from, you know, the Satan Disciples.  And so, you know, everybody straps it on and runs out and there's shootings and -- just senseless and sad because of what it does to that community.  It just breaks down the fabric of that community, and it harms the good people that are trying to work and take care of their lives.

The Cintron murder is really the hardest one to swallow through that trial because here was someone who had gone into the military and was gathering together with his friends to, you know, reunite and have a nice night out, and here he ends up, you know, diving across his friends to protect them from senseless gunfire and dying right there on top of them.  Just -- just absolutely horrific.

So the sanction for that has to be significant.

You're linked to both his murder as well as the other attempted murder, and that kind of violence is what is breaking

apart our community.

Add to that violence drug dealing, which also breaks down the community.  Once you're selling your drugs, then you're selling to someone who can no longer be a father, a spouse, a son, because they become addicted and that's all of their focus.

Then add to that the intimidation of witnesses.  I mean, here people that were trying to work with law enforcement and do the right thing became terrified because they were going to be harmed from the gang.

So I can't mitigate any of that activity.  It is really the type of activity that is breaking apart this beautiful community, and it's not something that can be explained except as something horrific.

Now, as far as history and characteristics of you, you started in the gang in your 20s.  That's aggravating, because some of these gang kids started when they were like 13, right? They didn't have moms and dads who were watching out for them, and they go to the gang for camaraderie, for support, for some kind of inclusivity, and they end up being mentored by gang members.  But you, you were old enough to make decisions here, and you stayed in that gang.

You had convictions along the way that never gave you any sentences of any merit.  Maybe that's part of the reason why you stayed.  I don't know.

But what I do know is that your involvement in the gang lasted a long time, and that you took a leadership role in it.  You collected the dues -- which, sadly, by the way, some of the dues were collected so they could pay for funerals of gang members, just so that there could be some money for somebody who inevitably was going to be killed.  Imagine that -- imagine being part of a club where you collect dues because one of the members of the club probably is going to be killed soon.  What a horrible concept.

So your role within the gang was certainly significant and one that I can't minimize.

I have to be very careful when I sentence multiple gang members.  And I have 34 of you, so I keep a chart, and I update it with each sentencing because I want to make sure that I don't have any unwarranted sentencing disparities.

The thing that you have to put yourself with are more like individuals who are involved with the murder and murder -- attempted murders.  And those are people like William Hayslette who got 360 months, Geronia Ford who got 348 months.

Yes, probably closest is Carlos Padilla who got 235 months, because he's in the same approximate sentencing range.

But when you start putting, you know, the murders in with your role, you can't be looking at some sanction that doesn't impose respect for the rule of law and afford general deterrence for those who are in a similar situation.

As far as your sentencing guidelines, they're 46, Category III. You know, so if I were to drop -- if I were to downward depart 10 levels, 10 levels, which is a huge departure, or variance if we -- you would be looking at 235 to 293, for a 10-level departure, which I don't see the mitigation to do that.

So because of your role within this horrific organization and the pervasiveness of it, I am sentencing you to 240 months' incarceration, followed by three years of supervised release.

You would be facing so much more but for the fact that you're maxed out with the statutory maximum.

The thing that I think is really critical to state here, though, because of the state of the law, even if I did not hold you responsible for the Cintron murder, I would still sentence you to 240 months, even if I didn't credit that factually.

So it's a 240-month sentence, followed by three years of supervised release.

No fine, no restitution, and $100 special assessment.

And I need to go through the conditions of supervised release for you now, so listen carefully because when you're released, you'll need to follow through with those.

They include that you shall not commit another federal, state, or local crime.

That you shall not unlawfully possess a controlled substance.

You shall cooperate in the collection of a DNA sample if required by the law.

And refrain from any unlawful use of a controlled substance.

And submit to one drug test within 15 days of release on supervised release, at least two periodic after that, up to 104.

Any objection to those mandatory conditions, Mr. Nash?

MR. NASH:  No.

THE COURT:  All right.  You shall provide financial support to any dependents if you're able.

You shall seek, and work conscientiously at, lawful employment.  If you're not gainfully employed, you shall pursue conscientiously a course of study or vocational training that will equip you for employment.

You shall not knowingly meet or communicate with any person that you know to be engaged in or planning to be engaged in criminal activity.

You shall refrain from excessive use of alcohol and from any use of a narcotic drug unless you have a prescription from a licensed medical practitioner.

You shall not possess a firearm, a destructive device, or other dangerous weapon.

You shall not knowingly leave from the federal judicial district where you're being supervised.

This is the Northern District of Illinois. We are the top 18 counties of the state. That's Cook, DuPage, Grundy, Kane, Kendall, Lake, LaSalle, Will, Boone, Carroll, DeKalb, Jo Daviess, Lee, McHenry, Ogle, Stephenson, Whiteside, and Winnebago.

If you get released to a different judicial district, you need to just learn what counties comprise that district because you'll need to stay there, without permission.

You shall report to the probation officer as directed at any reasonable time, at home, at a community service location, or another reasonable location specified by the probation officer.

And you shall permit the probation officer to confiscate any contraband that's found in plain view.

You shall notify Probation within 72 hours after you become aware of a change in your residence, your employer, or your workplace.

And unless you have a constitutional or other legal privilege, you shall truthfully answer the questions posed to you by Probation.

You shall notify Probation within 72 hours if you become arrested, charged with a crime, or even questioned by law enforcement.

SA 54

And you shall submit your person, your property, your house, your residence, your vehicles, your paper, your data storage, media, office, to a search conducted by the U.S. Probation Office.

Now, the search can only be done if the officer has reasonable suspicion that you violated a term of your supervision and that the area to be searched will contain evidence of that violation, and that search must be done at a reasonable time and in a reasonable manner, but you should tell people you live with that this is a condition of your release because failure to submit to the search could be grounds for revocation.

You shall participate in an approved job skill training program at the direction of Probation within the first 60 days of placement on supervision.

And you shall, if you become unemployed after 60 days or if unemployed for 60 days after a termination or layoff, you should perform community service at 20 hours per week, not to exceed 400 all together.

And you shall not enter into any agreement to act as an informer or a special agent of law enforcement without the permission of the Court.

Mr. Nash, any objections to those conditions?

MR. NASH:  No, Judge.

THE COURT:  Okay.  Any objections to those conditions?

MS. CHUNG:  No, your Honor.

THE COURT:  All right.  Probation, what am I forgetting, other than his appellate rights and placement?

PROBATION OFFICER:  Your Honor, back to Condition Number 16, is the Court removing "at work"?

THE COURT:  I am.

PROBATION OFFICER:  Okay.

THE COURT:  Yes, I don't think it's helpful when they're at work or at school being with the probation officer. I think there's other ways to do it.

PROBATION OFFICER:  Thank you, your Honor.

THE COURT:  Okay.  So you have a right to appeal this sentence, and you do so by filing a notice of appeal within 14 days of the entry of the judgment and conviction order.  That will go out tomorrow or the next day.  Mr. Nash can help you file the notice of appeal.

Do you have a placement request for him?

MR. NASH:  No, we haven't -- no, Judge.

THE COURT:  The one thing that I was -- the one thing --

MR. NASH:  Oxford, I would say then.

THE COURT:  Okay.  The one thing I was wondering is there is some use of drugs in his background, which included cocaine at one point, marijuana.  Alcohol did not seem to be a problem.  But, I mean, I think maybe the drug treatment program

in incarceration would be important for him.

MR. NASH:  I agree, Judge.

THE COURT:  All right.  So I'm going to add the RDAP program for him, so that when you get out, you don't have any concerns about drugs so that you can focus on your family and your work.

Anything that I've forgotten from the prosecutor?

MS. CHUNG:  No, your Honor.  Just a motion to dismiss the forfeiture allegation as to Mr. Jimenez.

THE COURT:  The forfeiture allegation will be dismissed.

And, sir, I wish you well as you move forward.  And I do believe that you are honest in your statements to the Court about really trying to move forward and put this chapter behind you, because it was an ugly chapter, but there's so much potential and people that care about you that I think you can, so I wish you well.

That will be the sentence of the Court.

THE CLERK:  All rise.  Court is adjourned.

MR. NASH:  Judge, this has nothing to do with the case, but your Honor, in ruling on the Rule 29 motion, I had made a reference to something in the Constitution or the bylaws, and your Honor's comment was appropriate.  And I, too, wonder how it found its way into a legal brief.

THE COURT:  Okay, I appreciate that.  Thank you.  All

SA 57

right, folks.  Have a good day.  Take care.

              MS. CHUNG:  Thank you, your Honor.

        (Concluded at 1:43 p.m.)

                  C E R T I F I C A T E

      I certify that the foregoing is a correct transcript of the

record of proceedings in the above-entitled matter.


*/s/ GAYLE A. McGUIGAN*                        *August 23, 2023*
GAYLE A. McGUIGAN, CSR, RMR, CRR
Official Court Reporter